972 P.2d 606

Penny KOTTERMAN, Panfilo Contreras, Frieda Baker, Rev., Dr. Gerald S. De-grow, Joanne Hilde, Michael J. Hoogen-dyk, Pastor Stanley Jones, Jann Renert, Louis Rhodes, James Ullman, and Rabbi Joseph Weizenbaum, Petitioners.

v.

Mark W. KILLIAN, in his official capacity as Director of the Arizona Department of Revenue, Respondent,

Lisa Graham Keegan, in her capacity as Superintendent of Public Instruction and as a parent and taxpayer; Emmett McCoy, Sr. and Alfreda McCoy, in their own behalves and as natural guardians of their children, Dallas McCoy, Krystal McCoy, Sean McCoy, Brandi McCoy, Daniel McCoy, and Priscilla McCoy; Tanya Phelps, in her own behalf and as natural guardian of her children, Tasha Phelps and Leanessa Phelps; Rita Samaniego, in her own behalf and as natural guardian of her children, Geraldo Wingate, Kristin Wingate, and Sarah Wingate; Felipe Sandoval, in his own behalf and as natural guardian of his children, Felicia Sandoval and Felipe Sandoval; Sally Shanahan, in her own behalf and as natural guardian of her children, Nathan Shanahan, Kaitlyn Shanahan, Gabriel Shanahan, and Jacob Shanahan; and Jeffry Flake and Trent Franks, as taxpayers; Arizona School Choice Trust, Inc., Intervenors/Respondents.

No. CV–97–0412–SA.

Supreme Court of Arizona, En Banc.

Jan. 26, 1999.

Robert Chanin, John M. West, and Alice O'Brien, Bredhoff & Kaiser PLLC, Washington, D.C., Susan G. Sendrow, Lieberman, Dodge, Sendrow & Gerding LTD, Phoenix, Alice Finn Gartell, Arizona Education Association, Phoenix, Thomas W. Pickrell, Arizona School Boards Association, Phoenix, Caroline A. Pilch, Yen & Pilch PLC, Phoenix, Elliot M. Mincberg and Judith E. Schaeffer, People for the American Way, Washington, D.C., Steven K. Green, Americans United for Separation of Church and State, Washington, D.C., Attorneys for Petitioners.

Hon. Grant Woods, Attorney General By: Thomas P. McGovern, Patrick Irvine, Michael F. Kempner and Gale Garriott, Phoenix, Attorneys for Respondent.

Clint Bolick, William H. Mellor, and Nicole S. Garnett, Institute for Justice, Washington, D.C., Patrick Byrne and Samuel Cowley, Snell & Wilmer, LLP, Phoenix, Richard W. Garnett, III, Scottsdale, Attorneys for Intervenors/Respondents Lisa Graham Keegan.

Michael J. Meehan, Meehan & Associates, Tucson, Attorney for Intervenor/Respondent, Arizona School Choice Trust.

Eleanor Eisenberg, Patrick D. Berry and Shari Lightstone, Phoenix, AzCLU Cooperating Attorneys, Phoenix, Attorney for Amicus Curiae American Civil Liberties Union.

Len Munsil, Center for Arizona Policy, Scottsdale, Attorney for Amicus Curiae Center for Arizona Policy.

Andrew S. Gordon and Samuel G. Coppersmith, Coppersmith & Gordon P.L.C., Phoenix, Attorneys for Amicus Curiae Arizona Hospital and Healthcare Association.

## OPINION

ZLAKET, C.J.

¶ 1 Petitioners challenge the constitutionality of A.R.S. § 43–1089 (1997), which allows a state tax credit of up to $500 for those who donate to school tuition organizations (STOs). The statute reads as follows:

A. For taxable years beginning from and after December 31, 1997, a credit is allowed against the taxes imposed by this title for the amount of voluntary cash contributions made by the taxpayer during the taxable year to a school tuition organization, but not exceeding five hundred dollars in any taxable year. The five hundred dollar limitation also applies to taxpayers who elect to file a joint return for the taxable year. A husband and wife who file separate returns for a taxable year in which they could have filed a joint return may each claim only one-half of the tax credit that would have been allowed for a joint return.

B. If the allowable tax credit exceeds the taxes otherwise due under this title on the claimant's income, or if there are no taxes due under this title, the taxpayer may carry the amount of the claim not used to offset the taxes under this title forward for not more than five consecutive taxable years' income tax liability.

C. The credit allowed by this section is in lieu of any deduction pursuant to § 170 of the internal revenue code and taken for state tax purposes.

D. The tax credit is not allowed if the taxpayer designates the taxpayer's donation to the school tuition organization for the direct benefit of any dependent of the taxpayer.

E. For purposes of this section:

1. "Qualified school" means a nongovernmental primary or secondary school in this state that does not discriminate on the basis of race, color, sex, handicap, familial status or national origin and that satisfies the requirements prescribed by law for private schools in this state on January 1, 1997.

2. "School tuition organization" means a charitable organization in this state that is exempt from federal taxation under § 501(c)(3) of the internal revenue code and that allocates at least ninety percent of its annual revenue for educational scholarships or tuition grants to children to allow them to attend any qualified school of their parents' choice. In addition, to qualify as a school tuition organization the charitable organization shall provide educational scholarships or tuition grants to students without limiting availability to only students of one school.

A.R.S. § 43–1089 (footnotes omitted). Petitioners claim that this law violates the Federal Establishment Clause and three provisions of the Arizona Constitution. We have original jurisdiction pursuant to Ariz. Const. art. VI, § 5(1) and Ariz. R. Spec. Act. 1(a) and 3(b).

### FEDERAL CONSTITUTION

■ ¶ 2 The Establishment Clause, applicable to the states by authority of the Fourteenth Amendment, proclaims that "Congress shall make no law respecting an establishment of religion." U.S. Const. amend. I; *see also Everson v. Board of Educ.,* 330 U.S. 1, 15, 67 S.Ct. 504, 511, 91 L.Ed. 711 (1947). The simplicity of this language belies its complex and continually evolving interpretation by the United States Supreme Court. *See generally* Kristin M. Engstrom, Comment, *Establishment Clause Jurisprudence: The Souring of Lemon and the Search for a New Test,* 27 Pac. L.J. 121 (1995); *see also* Andrew A. Adams, Note, *Cleveland, School Choice, and "Laws Respecting an Establishment of Religion,"* 2 Tex. Rev. L. & Pol. 165, 171–75 (1997). That Court's decisions reflect an effort to steer a course of "constitutional neutrality," *Walz v. Tax Comm'n,* 397 U.S. 664, 669, 90 S.Ct. 1409, 1411, 25 L.Ed.2d 697 (1970), aimed "between avoidance of religious establishment on the one hand, and noninterference with religious exercise on the other." Leonard J. Henzke, Jr., *The Constitutionality of Federal Tuition Tax Credits,* 56 Temp. L.Q. 911, 924 (1983). "The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." *Larson v. Valente,* 456 U.S. 228, 244, 102 S.Ct. 1673, 1683, 72 L.Ed.2d 33 (1982). Similarly, religion may not be preferred over nonreligion. *See Everson,* 330 U.S. at 18, 67 S.Ct. at 513.

¶ 3 This emphasis on neutrality is apparent in a recent line of Supreme Court cases upholding a variety of educational assistance programs. *See Agostini v. Felton,* 521 U.S. 203, ——, 117 S.Ct. 1997, 2016, 138 L.Ed.2d 391 (1997), *overruling Aguilar v. Felton,* 473 U.S. 402, 105 S.Ct. 3232, 87 L.Ed.2d 290 (1985) (public school teachers providing remedial education to disadvantaged children in parochial schools); *Rosenberger v. Rector & Visitors of the Univ. of Va.,* 515 U.S. 819, 845–46, 115 S.Ct. 2510, 2524–25, 132 L.Ed.2d 700 (1995) (state university funds used to pay printing costs of student newspaper espousing religious viewpoint); *Zobrest v. Catalina Foothills Sch. Dist.,* 509 U.S. 1, 3, 113 S.Ct. 2462, 2464, 125 L.Ed.2d 1 (1993) (sign-language interpreter provided for deaf student in sectarian high school); *Witters v. Washington Dep't of Servs. for the Blind,* 474 U.S.

481, 482, 106 S.Ct. 748, 749, 88 L.Ed.2d 846 (1986) (state financial assistance to blind student attending private Christian college); *Mueller v. Allen*, 463 U.S. 388, 390–91, 103 S.Ct. 3062, 3064–65, 77 L.Ed.2d 721 (1983) (state income tax deduction for educational expenses, including those incurred at sectarian schools).

¶ 4 Other courts in recent years have also found state educational aid programs to be in compliance with the First Amendment. *See Jackson v. Benson*, 218 Wis.2d 835, 578 N.W.2d 602, 619 (1998), *cert. denied*, ——— U.S. ———, 119 S.Ct. 466, 142 L.Ed.2d 419 (1998) (distribution of tuition vouchers for use in private, including sectarian, schools); *Matthew J. v. Massachusetts Dep't of Educ.*, 989 F.Supp. 380, 391–92 (D.Mass.1998) (reimbursement of special education tuition costs at private sectarian school).

■ ¶ 5 In *Lemon v. Kurtzman*, 403 U.S. 602, 612–13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971), the Supreme Court adopted a three-pronged test for evaluating compliance with the Establishment Clause. Simply stated, a statute does not violate the First Amendment if (1) it serves a secular purpose; (2) its principal or primary effect neither advances nor inhibits religion; and (3) it does not "foster an excessive government entanglement with religion." *Id.* (quoting *Walz*, 397 U.S. at 674, 90 S.Ct. at 1414). While other approaches have been considered by the Court,[1] we believe that the "well settled" *Lemon* standard provides an appropriate framework for our review. *See Mueller*, 463 U.S. at 394, 103 S.Ct. at 3066.

### Secular Purpose

■ ¶ 6 The Supreme Court rarely attributes an unconstitutional motive to a legislative act such as this, "particularly when a plausible secular purpose for the state's program may be discerned from the face of the statute." *Mueller*, 463 U.S. at 394–95, 103 S.Ct. at 3067. The Minnesota law at issue in

*Mueller* permitted a tax deduction for tuition, textbook, and transportation expenses of children attending elementary or secondary schools. *Id.* at 391, 103 S.Ct. at 3065. In upholding it, the Court said:

A state's decision to defray the cost of educational expenses incurred by parents—regardless of the type of schools their children attend—evidences a purpose that is both secular and understandable. An educated populace is essential to the political and economic health of any community, and a state's efforts to assist parents in meeting the rising cost of educational expenses plainly serves this secular purpose of ensuring that the state's citizenry is well-educated.

*Id.* at 395, 103 S.Ct. at 3067.

¶ 7 The Arizona Legislature has, in recent years, expanded the options available in public education. *See, e.g.*, A.R.S. § 15–181 (1994) (establishing charter schools in order to "provide additional academic choices for parents and pupils"); A.R.S. § 15–816.01(A) (1995) (requiring all public school districts to "implement an open enrollment program without charging tuition"). It now seeks to bring private institutions into the mix of educational alternatives open to the people of this state.

¶ 8 The encouragement of private schools, in itself, is not unconstitutional. Such a policy can properly be used to facilitate a state's overall educational goals. As the *Mueller* majority noted, private schools frequently serve to stimulate public schools by relieving tax burdens and producing healthy competition. 463 U.S. at 395, 103 S.Ct. at 3067 (quoting *Wolman v. Walter*, 433 U.S. 229, 262, 97 S.Ct. 2593, 2613, 53 L.Ed.2d 714 (1977) (Powell, J., concurring in part and dissenting in part)). They also further the objective of making quality education available to all children within a state. Thus, the legislature may "conclude that there is a strong public interest in assuring the continued financial health of private schools, both

---

1. *See Board of Educ. v. Grumet*, 512 U.S. 687, 705, 114 S.Ct. 2481, 2492, 129 L.Ed.2d 546 (1994) (finding creation of special school district for religious enclave violated "the requirement of government neutrality"); *Lee v. Weisman*, 505 U.S. 577, 586–87, 112 S.Ct. 2649, 2655, 120 L.Ed.2d 467 (1992) (holding that graduation benedictions in public schools coerce support for religion); *Wallace v. Jaffree*, 472 U.S. 38, 69–70, 105 S.Ct. 2479, 2496–97, 86 L.Ed.2d 29 (1985) (O'Connor, J., concurring) (setting forth the "endorsement test").

sectarian and non-sectarian." *Id.* at 395, 103 S.Ct. at 3067. In our view, the secular purpose prong of *Lemon* is satisfied here.

### Primary Effect

¶ 9 We next examine whether the principal effect of the law is to further "sectarian aims of the nonpublic schools." *Id.* at 396, 103 S.Ct. at 3067 (quoting *Committee for Pub. Educ. & Religious Liberty v. Regan*, 444 U.S. 646, 662, 100 S.Ct. 840, 851, 63 L.Ed.2d 94 (1980)). We begin by noting that the legislature's taxing authority is very broad. *See Kelly v. Allen*, 49 F.2d 876, 877 (9th Cir.1931) ("The power of the state to tax is unlimited."); *Tanque Verde Enters. v. City of Tucson*, 142 Ariz. 536, 542, 691 P.2d 302, 308 (1984) ("[S]etting tax rates is a legislative function."). Therefore, courts extend considerable deference and great latitude to the legislative creation of "classifications and distinctions in tax statutes." *Mueller*, 463 U.S. at 396, 103 S.Ct. at 3067 (quoting *Regan v. Taxation With Representation*, 461 U.S. 540, 547, 103 S.Ct. 1997, 2002, 76 L.Ed.2d 129 (1983)).

¶ 10 The *Mueller* Court identified certain significant features of the Minnesota statute in upholding its constitutionality, namely: (1) the deduction in question was one of many allowed by the state; (2) it was open to all parents incurring educational expenses; and (3) funds were available "only as a result of numerous, private choices of individual parents." 463 U.S. at 396–400, 103 S.Ct. at 3067–70. In other words, aid was provided on a neutral basis with any financial benefit to private schools sufficiently attenuated.

### One of Many

¶ 11 Petitioners contend that credits are constitutionally different from deductions, which they concede to be perfectly proper. At oral argument they asserted that a tax credit is the "functional equivalent of depleting the state treasury by a direct grant," while a tax deduction merely serves as "seed money" to encourage philanthropy. We disagree.

¶ 12 It is true, of course, that there are mechanical differences between deductions and credits. The former are subtracted from gross income, reducing the net amount on which a tax is assessed according to the taxpayer's marginal rate, while the latter are taken directly from the tax as tentatively calculated. Elizabeth A. Baergen, Note, *Tuition Tax Deductions and Credits in Light of Mueller v. Allen*, 31 Wayne L.Rev. 157, 172–73 (1984); *see* James J. Freeland et al., *Fundamentals of Federal Income Taxation* 969 (7th ed.1991). Moreover, limits placed on these benefits may be sharply divergent. We do not believe, however, that such distinctions are constitutionally significant. Though amounts may vary, both credits and deductions ultimately reduce state revenues, are intended to serve policy goals, and clearly act to induce "socially beneficial behavior" by taxpayers. Baergen, *supra*, at 173.

¶ 13 In *Committee for Public Education & Religious Liberty v. Nyquist*, a case heavily relied upon by the petitioners, the Supreme Court said that the constitutionality of a tax benefit "does not turn in any event on the label we accord it." 413 U.S. 756, 789, 93 S.Ct. 2955, 2974, 37 L.Ed.2d 948 (1973). This statement is consistent with the Court's earlier observation in *Lemon* that the form of any tax measure must be examined "for the light that it casts on the substance." 403 U.S. at 614, 91 S.Ct. at 2112. In *Nyquist*, a New York statute provided state funds for the maintenance and repair of private schools. It also contained a tax deduction for parents of children attending such schools. 413 U.S. at 762–64, 93 S.Ct. at 2960–61. The Supreme Court struck down these provisions, holding that they amounted to direct stipends having the primary effect of impermissibly advancing religion. *Id.* at 779–80, 791, 93 S.Ct. at 2969, 2975. It is important to note, however, that the New York "deduction," based on a statutory formula, was plainly designed to achieve a net per-family gain. *Id.* at 790, 93 S.Ct. at 2974. This preset benefit was offered to parents without regard for the amount of expense they actually incurred. *Id.*

¶ 14 As the *Mueller* Court described a decade later, *Nyquist* involved "thinly disguised 'tax benefits,' actually amounting to tuition grants, to the parents of children attending private schools." 463 U.S. at 394, 103 S.Ct. at 3066. The Court also observed

that the New York deduction had been totally inconsistent with others allowed under the laws of that state. *Id.* at 396 n. 6, 103 S.Ct. at 3068 n. 6. In contrast, the Minnesota deduction for actual school expenses was "only one among many" available under the state's tax code, including those for medical expenses and charitable contributions. *Id.* at 396, 103 S.Ct. at 3067. Unlike the measure in *Nyquist,* which was likened to an outright grant, the Minnesota statute embodied a "genuine tax deduction." *Id.* at 396 n. 6, 103 S.Ct. at 3068 n. 6.

¶ 15 Deductions and credits are legitimate tools by which government can ameliorate the tax burden while implementing social and economic goals. *See* Baergen, *supra,* at 172–76. We conclude that the Arizona school tuition tax credit is one of an extensive assortment of tax-saving mechanisms available as part of a "genuine system of tax laws." *Mueller* at 396 n. 6, 103 S.Ct. at 3068 n. 6. For instance, the state permits its taxpayers to take the full "amount of itemized deductions allowable" under the Internal Revenue Code. A.R.S. § 43–1042(A). This, of course, includes charitable contributions made directly to churches, religious schools, and other § 501(c)(3) organizations.[2] *See* 26 U.S.C. § 170(c)(2)(D). Arizona's tax code also provides for numerous credits beyond those permitted at the federal level, each operating in the same general way. *See* A.R.S. §§ 43–1071 through 43–1090.01. Among them is a credit for voluntary cash contributions made to qualifying organizations that provide assistance to the working poor. *See* A.R.S. § 43–1088. Such organizations clearly count among their number churches, synagogues, missions, and other sectarian institutions. Also noteworthy in the context of the present discussion is a $200 tax credit for *public* school extracurricular activity fees, covering items such as band uniforms, athletic gear, and scientific laboratory equipment. A.R.S. § 43–1089.01. Thus, as in Minnesota, the Arizona tax benefit now under consideration is "only one among many." *Mueller,* 463 U.S. at 396, 103 S.Ct. at 3067.

*Availability*

¶ 16 The *Mueller* Court placed particular emphasis on the fact that the benefits of Minnesota's tax deduction extended to a broad class of recipients, not just to the parents of private school children as in *Nyquist.* 463 U.S. at 397–98, 103 S.Ct. at 3068. By way of comparison, the Arizona tuition credit is available to all taxpayers who are willing to contribute to an STO. Any individual, not just a parent, may donate to the scholarship program. Thus, Arizona's class of beneficiaries is even broader than that found acceptable in *Mueller,* and clearly achieves a greater level of neutrality.

*Private Choices*

¶ 17 The Supreme Court also stressed the means by which funds reach sectarian schools and the importance of "numerous, private choices" in contrast to direct state financial aid. *Mueller,* 463 U.S. at 399, 103 S.Ct. at 3069. Where assistance to religious institutions is indirect and attenuated, i.e., private individuals choose where the funds will go, the Justices have generally been reluctant to find a constitutional impediment.

2. To qualify for § 501(c)(3) status an entity must be "organized and operated exclusively" for certain statutorily defined purposes. 26 U.S.C. § 501(c)(3). These include "religious, charitable [and] scientific" as well as "literary, or educational purposes." *Id.* The Supreme Court has determined that "Congress sought to provide tax benefits to charitable organizations, to encourage the development of private institutions that serve a useful public purpose or supplement or take the place of public institutions of the same kind." *Davis v. United States,* 495 U.S. 472, 482–83, 110 S.Ct. 2014, 2021, 109 L.Ed.2d 457 (1990) (quoting *Bob Jones Univ. v. United States,* 461 U.S. 574, 588, 103 S.Ct. 2017, 2026, 76 L.Ed.2d 157 (1983)). Consequently, under both federal and state law, organizations unabashedly devoted to promoting religion—churches and other religious institutions—enjoy a number of direct economic tax benefits. These organizations escape income taxes, *see* A.R.S. § 43–1201(4), (11), and are not required to file returns, *see* A.R.S. § 43–1242. Taxpayers who donate to them can deduct the contributions from their federal and state income taxes. *See* 26 U.S.C. § 170; A.R.S. § 43–1042(A). Additionally, many of these organizations are exempt from property taxes, *see* Ariz. Const. art. IX, § 2(2), a direct government benefit which has long been held nonviolative of the Establishment Clause. *See Walz,* 397 U.S. at 672–73, 90 S.Ct. at 1413–14.

*See Witters,* 474 U.S. at 488, 106 S.Ct. at 752 (aid flowing to religious institutions does so "only as a result of the genuinely independent and private choices of aid recipients"); *Zobrest,* 509 U.S. at 10, 113 S.Ct. at 2467 (presence of government-paid interpreter in sectarian school was result of the "private decision of individual parents").

¶ 18 A recent decision by the Wisconsin Supreme Court upholding the constitutionality of school vouchers provides further support. *Jackson v. Benson,* 218 Wis.2d 835, 578 N.W.2d 602 (1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 466, 142 L.Ed.2d 419 (1998). In 1995, the Wisconsin Legislature amended a statute requiring the state to pay the educational costs of low-income Milwaukee parents who desired to send their children to private schools. *Id.* at 607–08. Under the amended Milwaukee Parent Choice Program (MPCP), parents were permitted to select a private school, which could be sectarian or secular, and received a payment from the state to cover expenses. *Id.* at 608–09. The check was sent directly to the school but was made out to the parents, who endorsed it over to the educational institution. *Id.* at 609. No restrictions were placed on the use to which the school could put the money.[3] *Id.* The Wisconsin court held that the program was permissible under both the federal and state constitutions, *id.* at 607, stating in part:

> In our assessment, the importance of our inquiry here is not to ascertain the path upon which public funds travel under the amended program, but rather to determine who ultimately chooses that path. As with the programs in *Mueller* and *Witters,* not one cent flows from the State to a sectarian private school under the amended MPCP except as a result of the necessary

and intervening choices of individual parents.

*Id.* at 618.

¶ 19 Arizona's statute provides multiple layers of private choice. Important decisions are made by two distinct sets of beneficiaries—taxpayers taking the credit and parents applying for scholarship aid in sending their children to tuition-charging institutions. The donor/taxpayer determines whether to make a contribution, its amount, and the recipient STO. The taxpayer cannot restrict the gift for the benefit of his or her own child. A.R.S. § 43–1089(D). Parents independently select a school and apply to an STO of their choice for a scholarship. Every STO must allow its scholarship recipients to "attend *any* qualified school of their parents' choice," and may not limit grants to students of only one such institution. A.R.S. § 43–1089(E)(2) (emphasis added). Thus, schools are no more than indirect recipients of taxpayer contributions, with the final destination of these funds being determined by individual parents.

¶ 20 The decision-making process is completely devoid of state intervention or direction and protects against the government "sponsorship, financial support, and active involvement" that so concerned the framers of the Establishment Clause. *Walz,* 397 U.S. at 668, 90 S.Ct. at 1411. As the *Mueller* Court noted, "[t]he historic purposes of the clause simply do not encompass the sort of attenuated financial benefit, ultimately controlled by the private choices of individual parents, that eventually flows to parochial schools from the neutrally available tax benefit." 463 U.S. at 400, 103 S.Ct. at 3070. Under the circumstances, we believe that "[n]o reasonable observer is likely to draw from [these facts] an inference that the State itself is endorsing a religious practice or belief." *Witters,* 474 U.S. at 493, 106 S.Ct. at

---

3. The dissent believes that limits must be placed on the uses to which schools may put tuition money coming from STOs. *Infra* at ¶ 94. But *Mueller* itself, while disallowing a tax deduction for the cost of textbooks used for religious instruction, placed no restriction on the uses to which the schools could put tuition payments qualifying for the deduction. *See* 463 U.S. at 390 n. 1, 103 S.Ct. at 3064 n. 1. In addition, the statute in *Mueller* contained no "opt out" provi-

sion or requirement that schools admit students without regard to religion, features that our dissenting colleague finds so critical in *Jackson.* *Infra* at ¶ 99. Our tax credit statute is more like the tax deduction in *Mueller* than the voucher program in *Jackson.* Even in *Jackson,* however, no limits were placed on the uses to which the recipient schools could put the state aid. 578 N.W.2d at 609.

755 (O'Connor, J., concurring); *see also Zobrest,* 509 U.S. at 10, 113 S.Ct. at 2467.

▮ ¶ 21 The dissent essentially characterizes the option offered to taxpayers as a sham because "there is no real choice—one may contribute up to $500 to support private schools or pay the same amount to the Arizona Department of Revenue."[4] *Infra* at ¶ 90. Such an argument plainly ignores the many other credits and deductions available in Arizona. It also assumes that maximum tax avoidance is the inescapable motive of taxpayers in every decision they make. We know, however, that people frequently donate to causes or organizations offering limited or no tax benefits. Moreover, while it seems a part of human nature to bemoan taxes, their importance to society is generally recognized. This tax credit may provide incentive to donate, but there is no arm twisting here. Those who do not wish to support the school tuition program are not obligated to do so. They are free to take advantage of a variety of other tax benefits, or none at all.

¶ 22 We see little difference in the levels of choice available to parents under the Minnesota and Arizona plans. In both, parents are free to participate or not, to choose the schools their children will attend, and to take advantage of all other available benefits under the state tax scheme. Moreover, these programs will undoubtedly bring new options to many parents. Basic education is compulsory for children in Arizona, A.R.S. § 15–802(A), but until now low-income parents may have been coerced into accepting public education. These citizens have had few choices and little control over the nature and quality of their children's schooling because they have been unable to afford a private education that may be more compatible with their own values and beliefs. Arizona's tax credit achieves a higher degree of parity by making private schools more accessible and providing alternatives to public education. *See Mueller,* 463 U.S. at 402, 103 S.Ct. at 3070–71 (educational expense deduction worked as set-off against added financial burden faced by parents of private school students); *Jackson,* 578 N.W.2d at 619

(school voucher program "place[d] on equal footing options of public and private school choice, and vest[ed] power in the hands of parents to choose where to direct the funds allocated for their children's benefit").

▮ ¶ 23 Petitioners argue that this law is fatally deficient because religious schools are the practical beneficiaries of the tax credit. They contend that the "pervasively sectarian" composition of private schools in this state presumes an inevitable constitutional breach. Like the appellants in *Mueller,* petitioners purport to rely on a statistical analysis of private school populations. *See* 463 U.S. at 400–01, 103 S.Ct. at 3070. The Supreme Court dismissed this approach as follows:

> We would be loath to adopt a rule grounding the constitutionality of a facially neutral law on annual reports reciting the extent to which various classes of private citizens claimed benefits under the law. Such an approach would scarcely provide the certainty that this field stands in need of, nor can we perceive principled standards by which such statistical evidence might be evaluated. Moreover, the fact that private persons fail in a particular year to claim the tax relief to which they are entitled—under a facially neutral statute—should be of little importance in determining the constitutionality of the statute permitting such relief.

*Id.* at 401, 103 S.Ct. at 3070. According to the statistics offered in *Mueller,* ninety-five percent of Minnesota's private school students attended sectarian schools. *Id.* at 391, 103 S.Ct. at 3065. Petitioners' numbers reflect a lower rate of religious school attendance in Arizona. Like the *Mueller* Court, however, we refuse to hinge constitutional scrutiny on such ephemeral numbers. School populations change, as does the quality of education. No one yet knows how many taxpayers will take the credit, what dollar amounts will be generated, or how many students will receive tuition scholarships, let alone their statistical distribution among schools. We also cannot predict how

---

4. This statement, like so many others in the dissent, wrongly gives the impression that private schools, rather than scholarship recipients, are the primary beneficiaries of contributions.

this tax credit may affect the ratio of secular to sectarian private institutions in the state.

¶ 24 Both Minnesota and Arizona provide by statute for free public education. *See* Minn.Stat. § 120.06 (1959); A.R.S. § 15–816.01 (1995). Consequently, parents of children seeking to attend tuition-charging schools are those most in need of financial assistance. This does not mean, however, that the statute unconstitutionally benefits a narrow segment of the population. As we have seen, the Arizona tax credit allows *all* taxpayers to give their funds voluntarily in support of a multi-dimensional educational system for the state, and its benefits flow in virtually every direction.

¶ 25 It is argued that A.R.S. § 43–1089 is unconstitutional because it does not provide a credit for those who wish to support public education. We disagree. A contemporaneous and related statute, A.R.S. § 43–1089.01, allows a tax credit of up to $200 for fees paid by taxpayers in support of public school extracurricular activities. The fact that this benefit is capped at $200 does not render the $500 credit for STO donations unconstitutional. The tuition expense of a private education is usually greater than the fees associated with extracurricular activities in a public school. The legislature's decision to set a lower amount for the latter is likely an acknowledgment of that disparity. Moreover, it strikes us as meaningless to offer a tax credit for tuition scholarships to schools that charge no tuition. The taxpayers in this state already pay for the establishment and operation of a public school system. Even parents who send their children to private schools must pay taxes in support of public education. Finally, because the ultimate goal of educational assistance programs is to reimburse parents for expenses incurred in schooling their children, a credit for contributions to the "educational mission of the public school system," *infra* at ¶ 76, is both distinguishable and unnecessary for purposes of our constitutional analysis.

¶ 26 The primary beneficiaries of this credit are taxpayers who contribute to the STOs, parents who might otherwise be deprived of an opportunity to make meaningful decisions about their children's edu-

cations, and the students themselves. We realize, of course, that the benefits do not end there. The ripple effects can, when viewed through a wide-angle lens, radiate to infinity. But while direct subsidies to sectarian schools may affront the Constitution, "the Establishment Clause is not violated every time money previously in the possession of a State is conveyed to a religious institution." *Witters*, 474 U.S. at 486, 106 S.Ct. at 751. Private and sectarian schools are at best only incidental beneficiaries of this tax credit, a neutral result that we believe is attenuated enough to satisfy *Mueller* and the most recent Establishment Clause decisions. *See* 463 U.S. at 399, 103 S.Ct. at 3069; *Agostini*, 521 U.S. at ——, 117 S.Ct. at 2014; *Zobrest*, 509 U.S. at 8, 113 S.Ct. at 2466; *Witters*, 474 U.S. at 488–89, 106 S.Ct. at 752; *Matthew J.*, 989 F.Supp. at 392.

¶ 27 In summary, we conclude that the tuition tax credit does not prefer one religion over another, or religion over nonreligion. It aids a "broad spectrum of citizens," *Mueller*, 463 U.S. at 399, 103 S.Ct. at 3069, allows a wide range of private choices, and does not have the primary effect of either advancing or inhibiting religion.

### Excessive Entanglement

¶ 28 Finally, we find no "excessive government entanglement with religion." *Lemon*, 403 U.S. at 613, 91 S.Ct. 2105 (citation omitted). The state does not involve itself in the distribution of funds or in monitoring their application. Its role is entirely passive. Taxpayers who choose to participate may deduct the amount of an STO contribution on their tax returns. The STO operates free of government interference beyond ensuring that it qualifies for § 501(c)(3) tax exempt status and complies with state requirements. Any perceived state connection to private religious schools is indirect and attenuated.

¶ 29 We are persuaded that § 43–1089 falls within the parameters of the Establishment Clause.

### ARIZONA CONSTITUTION

¶ 30 Petitioners argue that this tax credit channels public money to private and sectari-

an schools in violation of the state constitution. Specifically, they charge that the law offends article II, § 12 and article IX, § 10 (the "religion clauses"), as well as article IX, § 7 (the "anti-gift clause").

 ¶ 31 Legislative enactments are presumptively constitutional. *Hall v. A.N.R. Freight Sys.*, 149 Ariz. 130, 133, 717 P.2d 434, 437 (1986). The party challenging a statute bears the burden of demonstrating its invalidity, *State v. Arnett*, 119 Ariz. 38, 48, 579 P.2d 542, 552 (1978), and we resolve all uncertainties in favor of constitutionality. *Arizona Downs v. Arizona Horsemen's Found.*, 130 Ariz. 550, 554, 637 P.2d 1053, 1057 (1981).

### Religion Clauses

¶ 32 Article II, § 12 states in part: "No public money or property shall be appropriated for or applied to any religious worship, exercise, or instruction, or to the support of any religious establishment." Article IX, § 10 says, "No tax shall be laid or appropriation of public money made in aid of any church, or private or sectarian school, or any public service corporation."

#### "Public Money or Property"

¶ 33 The parties are in considerable disagreement over the meaning of "public money or property." No definition of these words appears in the Arizona Constitution or in our statutes. We must therefore look to their "natural, obvious and ordinary meaning." *County of Apache v. Southwest Lumber Mills*, 92 Ariz. 323, 327, 376 P.2d 854, 856 (1962); *see also McElhaney Cattle Co. v. Smith*, 132 Ariz. 286, 290, 645 P.2d 801, 805 (1982) ("When the words of a constitutional provision are not defined within it, the meaning to be ascribed to the words is that which is generally understood and used by the people."); *Dunn v. Industrial Comm'n*, 177 Ariz. 190, 194, 866 P.2d 858, 862 (1994) (requiring court to give clear and unambiguous statutory language its plain meaning unless doing so would lead to absurd results).

¶ 34 In *McClead v. Pima County*, our court of appeals observed that "state funds" are those "raised by the operation of some general law and therefore belonging to the state." 174 Ariz. 348, 356, 849 P.2d 1378, 1386 (App.1992). A decade earlier we identified "state money" as "money in the state treasury credited to a particular fund therein." *Grant v. Board of Regents*, 133 Ariz. 527, 529, 652 P.2d 1374, 1376 (1982). State title to funds, however, does not always vest when money enters the state treasury. For example, when the government is a mere custodian or conduit, funds so held do not constitute "state monies." *Navajo Tribe v. Arizona Dep't of Admin.*, 111 Ariz. 279, 280–81, 528 P.2d 623, 624–25 (1974).

¶ 35 Other courts have reached similar conclusions. *See Philip Morris Inc. v. Glendening*, 349 Md. 660, 709 A.2d 1230, 1241 (1998) ("gross recovery from the tobacco litigation is not 'State' or 'public' money" until deposited into state treasury); *State Bd. of Accounts v. Indiana Univ. Found.*, 647 N.E.2d 342, 348 (Ind.Ct.App.1995) (private donations received by corporation for use or benefit of state university were not public funds because they did not come into the possession of, and were not entrusted to, a public officer); *Sherard v. State*, 244 Neb. 743, 509 N.W.2d 194, 199–200 (1993) (money in workers' compensation Second Injury Fund is not state property because it is not raised by taxation and is held in trust by custodian, State Treasurer); *Parsons v. South Dakota Lottery Comm'n*, 504 N.W.2d 593, 596 (S.D.1993) (state lottery prize proceeds not public funds because money does not revert to state's general fund); *McIntosh v. Aubry*, 14 Cal.App.4th 1576, 18 Cal. Rptr.2d 680, 688–89 (1993) (rent forbearance and inspection cost waivers are not public funds because they involve no payment of funds out of county coffers); *Wells v. Kentucky Local Correctional Facilities Constr. Auth.*, 730 S.W.2d 951, 955 (Ky.Ct.App.1987) (construction bond proceeds do not constitute state monies because they are trust funds not in control of any state organization); *State ex rel. Sego v. Kirkpatrick*, 86 N.M. 359, 524 P.2d 975, 986 (1974) (private donations to state university under control of Board of Regents are not subject to appropriation, therefore legislature has no power to limit use or disbursement of these funds).

¶ 36 According to Black's Law Dictionary, "public money" is "[r]evenue received from federal, state, and local governments from taxes, fees, fines, etc." *Black's Law Dictionary* 1005 (6th ed.1990). As respondents note, however, no money *ever* enters the state's control as a result of this tax credit. Nothing is deposited in the state treasury or other accounts under the management or possession of governmental agencies or public officials. Thus, under any common understanding of the words, we are not here dealing with "public money."

¶ 37 Petitioners suggest, however, that because taxpayer money *could* enter the treasury if it were not excluded by way of the tax credit, the state effectively controls and exerts quasi-ownership over it. This expansive interpretation is fraught with problems. Indeed, under such reasoning all taxpayer income could be viewed as belonging to the state because it is subject to taxation by the legislature. That body has plenary power to set tax rates, categorize taxable income, and determine the type and amount of adjustments including deductions, exemptions, and credits. *See Tanque Verde Enters.*, 142 Ariz. at 539–40, 691 P.2d at 305–06 (recognizing the virtually unlimited authority of taxing bodies to set rates of taxation).

¶ 38 Equally problematic is the fact that petitioners' contention directly contradicts the decades-long acceptance of tax deductions for charitable contributions, including donations made directly to churches, religiously-affiliated schools and institutions. If credits constitute public funds, then so must other established tax policy equivalents like deductions and exemptions. Indeed, it seems to us that unless a constitutionally significant difference between credits and deductions can be demonstrated, petitioners' argument must fail. The dissent, recognizing this dilemma, attempts to construct a distinction based on an alleged disparity in the amount of benefits flowing from credits and deductions. That, however, would appear to be a matter of form rather than substance. In our judgment, neither the dissent nor petitioners have offered a principled way in which to address this contradiction.

¶ 39 The calculation of personal income tax can be broken into several stages. First comes a determination of adjusted gross income, achieved by combining all sources of income and subtracting certain expenditures, such as contributions to individual retirement and medical savings accounts. *See* I.R.S. Form 1040, U.S. Individual Income Tax Return, Lines 7 through 32 (1997); Arizona Form 140, Resident Personal Income Tax Return, Lines 11 through 14 (1997). Next, taxpayers may take certain deductions and exemptions. The resulting subtotal is taxable income. *See* Arizona Form 140, Lines 15 through 26. This figure is then referenced to the tables for a determination of preliminary tax liability. *Id.* at Line 27. But the process does not end there. In fact, this point occurs about midway through the tax calculation and is, at most, a determination of *tentative*, not *actual*, tax liability. *See* Freeland, *supra*, at 969. The tax preparer may continue to reduce this amount by subtracting credits and other payments. Only after exhausting all of these opportunities does the taxpayer arrive at the bottom of the tax form and the inevitable—amount owed.

¶ 40 We do not accept the proposition, implicit in petitioners' argument, that the tax return's purpose is to return state money to taxpayers. For us to agree that a tax credit constitutes public money would require a finding that state ownership springs into existence at the point where taxable income is first determined,[5] if not before. The tax on that amount would then instantly become public money. We believe that such a conclusion is both artificial and premature. It is far more reasonable to say that funds remain in the taxpayer's ownership *at least* until final calculation of the amount actually owed to the government, and upon which the state has a legal claim.[6]

5. This occurs at Line 26, Arizona Form 140, Resident Personal Income Tax 1997. But we note that the amount finally owed by the taxpayer does not appear until Line 55.

6. As previously noted, it can be argued that state ownership does not arise until funds actually enter the state's possession. However, we need not make that determination here.

¶ 41 We realize that this view may conflict with the "tax expenditure" approach advanced by the petitioners. Nevertheless, it is consistent with the traditional method of constitutional construction that accords to words their plain and simple meaning. The tax expenditure theory is of recent origin, having been first advanced by Professor Stanley Surrey during the late 1960s and early '70s. *See* Richard P. Davies, *A Flat Tax Without Bumpy Philanthropy: Decreasing the Impact of a "Low, Single Rate" on Individual Charitable Contributions,* 70 S. Cal. L.Rev. 1749, 1767 (1997). Proponents of the concept argue that deductions, credits, exemptions, and exclusions "constitute a form of hidden spending in the tax code and ought accordingly to be compared with equivalent nontax spending programs." Michael A. Livingston, *Reinventing Tax Scholarship: Lawyers, Economists, and the Role of the Legal Academy,* 83 Cornell L.Rev. 365, 377 n. 30 (1998). This theory has been used by government as a tool for analyzing budgetary policy.[7] *See* Jean Harris, *Tax Expenditures: Concept and Oversight, in* Public Budgeting and Finance 385, 397 (Robert T. Golembiewski & Jack Rabin, eds., 4th rev. ed.1997). It has not, however, been universally accepted as a doctrine of judicial decision-making.[8] Even the Supreme Court's treatment of the concept "changes depending on the substantive area of law being considered." Donna D. Adler, *The Internal Revenue Code, the Constitution, and the Courts: The Use of Tax Expenditure Analysis in Judicial Decision Making,* 28 Wake Forest L.Rev. 855, 857 (1993). As the author notes:

> [T]he Court has fully accepted the equivalence of direct spending programs and tax expenditures in the area of Free Speech rights, but it has not fully applied this concept in the context of Establishment Clause analysis. . . . [D]ifferent constitutional standards have been applied to direct spending programs and to tax expenditures that have the same economic effect. For example, the refusal to treat tax expenditures and direct spending programs in a consistent manner allows benefits to flow to religious institutions through the Internal Revenue Code when the same benefits would be struck down if distributed in a direct spending program.

*Id.* (citation omitted). In the same term of Court, now Chief Justice Rehnquist wrote both *Regan v. Taxation With Representation,* 461 U.S. 540, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983), a "Free Speech" case, and *Mueller,* an "Establishment Clause" decision. We assume it is no accident that the tax expenditure thesis appears in the former opinion, but not in the latter. The Court has generally refused to recognize the tax expenditure concept where religion is involved.[9] *See* Joseph M. Kuznicki, Comment, *Section 170, Tax Expenditures, and the First Amendment: The Failure of Charitable Religious Contributions for the Return of a Religious Benefit,* 61 Temp. L.Rev. 443, 473 (1988).

¶ 42 Modern economic theory, under some circumstances, may be helpful to our understanding. As has been shown, however, it does not necessarily govern constitutional interpretation. *But see Opinion of the Justices to the Senate,* 401 Mass. 1201, 514 N.E.2d 353, 355 (1987) (advisory opinion stating that "tax expenditures . . . are the practical equivalent of direct government grants"). Moreover, while the plain language of the provisions now under consideration indicates that the framers opposed direct public funding of religion, including sectarian schools, we see no evidence of a similar concern for indirect benefits. One court has noted a similar distinction in the context of a state Freedom of Information Act (FOIA). *Sebastian County Chapter of the Am. Red Cross v. Weatherford,* 311

7. Of course, as is true in any area of intellectual discourse, many other competing theories exist. In economics these days, three of the most prominent are the comprehensive tax base approach, optimal tax theory, and fiscal exchange or public choice theory. *See* Livingston, *supra,* at 381–83.

8. Or even legislative decision-making, for that matter. "The grant of dollars through the tax system is not widely perceived in Congress as a disbursement of public funds." Allen Schick, *Congress and Money: Budgeting, Spending and Taxing* 550 (1980).

9. The dissent relies on a one-justice concurring opinion in arguing that a contrary view has been adopted by the Supreme Court. *Infra* at ¶ 143.

Ark. 656, 846 S.W.2d 641 (1993). That court said:

> Refusal to read indirect government benefits or subsidies into the term "public funds" is not at odds with a liberal construction of FOIA. Were we to construe "public funds" to include an entirely separate and new category of government support, we would be amending the FOIA to expand its application significantly.

*Id.* at 644.

¶ 43 We also note with interest that Arizona's framers did not hesitate to extend tax-exempt status to churches. *See* Ariz. Const. art. IX § 2(2). In fact, they uniformly supported property tax exemptions for all "religious associations or institutions not used or held for profit." *Id.; see also The Records of the Arizona Constitutional Convention of 1910* 469–76, 850, 861, 891, 931, 933–34 (John S. Goff, ed.1991) (hereinafter *"Records "*). Clearly, these exemptions constitute benefits to religious organizations, suggesting either that the framers did not regard such tax-saving measures as direct grants of "public money," or that their intent in prohibiting aid to religious institutions was not as all-encompassing as petitioners would have us hold.

### *"Appropriated For or Applied To "*

¶ 44 An appropriation "set[s] aside from the public revenue ... a certain sum of money for a specified object, in such a manner that the executive officers of the government are authorized to use that money." *Rios v. Symington*, 172 Ariz. 3, 6–7, 833 P.2d 20, 23–24 (1992) (quoting *Hunt v. Callaghan*, 32 Ariz. 235, 239, 257 P. 648, 649 (1927)). The power of appropriation belongs only to the legislature. *Prideaux v. Frohmiller*, 47 Ariz. 347, 357, 56 P.2d 628, 632 (1936).

¶ 45 Petitioners argue that the STO tax credit diverts to private schools funds that would otherwise be state revenue. This, they claim, has the same effect as an appropriation. We agree that *Community Council v. Jordan*, 102 Ariz. 448, 455, 432 P.2d 460, 467 (1967), rejected a narrow interpretation of "appropriations," finding the word to encompass executive and administrative contracts as well as disbursements. It does not

follow, however, that reducing a taxpayer's liability is the equivalent of spending a certain sum of money. An appropriation earmarks funds from "the general revenue of the state" for an identified purpose or destination. *Black & White Taxicab Co. v. Standard Oil Co.*, 25 Ariz. 381, 399, 218 P. 139, 145 (1923). Furthermore, we disagree with petitioners' characterization of this credit as public money or property within the meaning of the Arizona Constitution. Therefore, we are unwilling to hold that a proscribed appropriation or application occurs by operation of this statute.

### *Religious worship, exercise, aid, or establishment*

¶ 46 Section 12 prohibits the use of public money for religious worship, exercise, instruction, or to support any religious establishment. Even if we were to agree that an appropriation of public funds was implicated here, we would fail to see how the tax credit for donations to a student tuition organization violates this clause. The way in which an STO is limited, the range of choices reserved to taxpayers, parents, and children, the neutrality built into the system—all lead us to conclude that benefits to religious schools are sufficiently attenuated to foreclose a constitutional breach.

¶ 47 As discussed earlier, safeguards built into the statute ensure that the benefits accruing from this tax credit fall generally to taxpayers making the donation, to families receiving assistance in sending children to schools of their choice, and to the students themselves. *See* A.R.S. § 43–1089(E)(2). Moreover, to qualify for § 501(c)(3) tax treatment, the STO must supply the Internal Revenue Service with copies of the scholarship application and program brochures, rules of eligibility, selection criteria and scholarship processing procedures. I.R.S. Publication 557, at 19 (Rev. May 1997).

¶ 48 The dissent expresses concern over the prospect that an Arizona taxpayer might be able to make a profit by taking both the state tuition credit and a charitable deduction on the federal return. *Infra* at ¶ 148 n. 17. Whether or not such a maneuver would be

possible or allowable is a policy matter for the legislature and the taxing authorities to address, rather than this court. It in no way changes our constitutional analysis. Similarly, our role is not to make judgments about the overall wisdom of the tax credit before us. That obligation falls to the other branches of government. We hold that the school tax credit does not violate article II, § 12 of the Arizona Constitution.

¶ 49 As previously indicated, article IX, § 10 states that "[n]o tax shall be laid or appropriation of any public money made in aid of any church, or private or sectarian school, or any public service corporation." It applies to all private schools, whether sectarian or not.

¶ 50 We have already concluded that this tax credit is not an appropriation of public money. Likewise, no tax has been laid here. To the contrary, this measure *reduces* the tax liability of those choosing to donate to STOs. We cannot say that the legislature has somehow imposed a tax by declining to collect potential revenue from its citizens. Nor does this credit amount to the laying of a tax by causing an increase in the tax liability of those not taking advantage of it. Such a construction tortures the plain meaning of the constitutional text. In addition, if we were to conclude that this credit amounts to the laying of a tax, we would be hard pressed to identify the citizens on whom it is assessed. Because we see no constitutional difference between a credit and a deduction, we would also be forced to rule that deductions for charitable contributions to private schools were unconstitutional because they too, would amount to the laying of a tax. This we decline to do. We find no violation of article IX, § 10 of the Arizona Constitution.

### Anti–Gift Clause

¶ 51 Under article IX, § 7, the state shall not "give or loan its credit in the aid of, or make any donation or grant, by subsidy or otherwise, to any individual, association, or corporation." We have upheld giving when the state action served a public purpose and adequate consideration was provided for the public benefit conferred. *See*

*Wistuber v. Paradise Valley Unified Sch. Dist.*, 141 Ariz. 346, 348–49, 687 P.2d 354, 356–57 (1984) (holding that state payment of portion of teacher association president's salary did not violate anti-gift clause).

¶ 52 This constitutional provision was historically intended to protect against the "extravagant dissipation of public funds" by government in subsidizing private enterprises such as railroad and canal building in the guise of "public interest." *State v. Northwestern Mutual Ins. Co.*, 86 Ariz. 50, 53, 340 P.2d 200, 201 (1959) (citation omitted). Such "evils" do not exist here. Neither do we agree with petitioners that a tax credit amounts to a "gift." One cannot make a gift of something that one does not own.

### Framers' Intent

¶ 53 Petitioners claim that Arizona's founders intended to implement a much more stringent prohibition against aid to religion than did their federal counterparts. They offer an historical analysis in support of this position. The dissent, despite acknowledging the "explicit text" of the constitution, *infra* at ¶ 73, advances a similar argument. We are persuaded, however, that our textual analysis is sufficient to decide the issues presented here.

¶ 54 "We interpret constitutional provisions by examining the text and, *where necessary*, history in an attempt to determine the framers' intent." *Boswell v. Phoenix Newspapers, Inc.*, 152 Ariz. 9, 12, 730 P.2d 186, 189 (1986) (emphasis added). Even if we agreed that an historical search for the framers' intent was appropriate, we would not conclude that the statute in question violates the Arizona Constitution. There is sparse recorded evidence respecting the clauses at issue here, and any historical analysis is necessarily filled with speculation. *See* Thomas E. Sheridan, *Arizona: A History* 385 (1995) ("There is also no comprehensive history of the Arizona constitutional convention or the political milieu out of which it arose."). The verbatim transcript of the 1910 constitutional convention reveals little discussion on the convention floor about the religion clauses. *See Records, supra,* at 660,

894, 940. "In reading through the proceedings one is impressed by the fact that major issues were often glossed over with no debate or discussion." *Records, supra,* at iv. Our dissenting colleague has himself noted that "[t]his court has properly been skeptical of some approaches to divining legislative intent." *Business Realty v. Maricopa County,* 181 Ariz. 551, 558, 892 P.2d 1340, 1347 (1995). We believe even greater skepticism is called for in "divining" the intent of language drafted almost 90 years ago and about which so little has been recorded or preserved. Thus, we cannot subscribe with any confidence to the "framers' indisputable desire to exceed the federal requirements" of the Establishment Clause. *Infra* at ¶ 130.

¶ 55 Moreover, the boundaries limiting judicial interpretation of framers' intent are amorphous and "subject to continuous adjustment." Terrance Sandalow, *Constitutional Interpretation,* 79 Mich. L.Rev. 1033, 1033 (1981). A provision's meaning is necessarily conditioned by contemporary understandings of the drafters' intentions. *Id.* at 1065. In practice, courts engaging in the search for original intent often look for the "larger purposes" to which the constitution gives expression, *id.* at 1037, mediating differences between the historical document and the need to accommodate changing circumstances and the passage of time. *See id.* at 1036. Further, "historical analysis does not suggest that the original intent of the drafters—an uncertain concept at best—governs or controls the interpretation of those clauses today; it merely recognizes that the history of a constitutional provision influences future interpretations to some degree." Robert F. Utter & Edward J. Larson, *Church and State on the Frontier: The History of the Establishment Clauses in the Washington State Constitution,* 15 Hastings Const. L.Q. 451, 451 (1988).

¶ 56 For example, in *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), the Supreme Court considered the framers' intent in adopting the Fourteenth Amendment, including the political climate of the time and long-standing practices of racial segregation. *Id.* at 489–90, 74 S.Ct. at 688–89. The Court stated:

In approaching this problem, we cannot turn the clock back to 1868 when the Amendment was adopted, or even to 1896 when Plessy v. Ferguson was written. We must consider public education in the light of its full development and its present place in American life throughout the Nation. Only in this way can it be determined if segregation in public schools deprives these plaintiffs of the equal protection of the laws.

*Id.* at 492–93, 74 S.Ct. at 691.

¶ 57 We have said as much ourselves in the very context of Arizona's religion clauses:

The state constitutional provisions must be viewed in light of *contemporaneous assumptions* concerning the appropriate sphere of action for each institution. History is clear that as a state evolves from one decade to another the role of the state "transcends traditional boundaries and assumes new dimensions" necessitating a revision of the idiomatic meaning of "separation" to align it with "the new realities if original purposes and expectations are to be realized."

*Community Council,* 102 Ariz. at 451–52, 432 P.2d at 463–64 (quoting Donald A. Giannella, *Religious Liberty, Nonestablishment, and Doctrinal Development,* 80 Harv. L.Rev. 1381, 1383 (1967)) (emphasis added).

¶ 58 This court long ago rejected "the strict view that in essence no public monies may be channeled through a religious organization for any purpose whatsoever without, in fact, aiding that church contrary to constitutional mandate." *Community Council,* 102 Ariz. at 451, 432 P.2d at 463. Instead, we said:

The prohibitions against the use of public assets for religious purposes were included in the Arizona Constitution to provide for the historical doctrine of separation of church and state, the thrust of which was to insure that there would be no state supported religious institutions thus precluding governmental preference and favoritism of one or more churches.

*Id.* In fact, as we review Arizona history and scan the present day horizon, it is apparent that religion has never been hermetically

sealed off from other institutions in this state, or the nation. *See, e.g., Bauchman v. West High Sch.,* 132 F.3d 542, 554 (10th Cir.1997) ("Courts have long recognized the historical, social and cultural significance of religion in our lives and in the world, generally."). Arizona's motto, *Ditat Deus,* means "God enriches." *See* Ariz. Const. art. XXII, § 20. And even though, as we have noted, the transcripts of our constitutional convention reveal almost nothing about the clauses in question, they clearly reflect religion as part of the proceedings. Each day's session was opened by a prayer from the convention chaplain, Rev. Seaborn Crutchfield. Indeed, to this day Arizona legislative sessions begin with a prayer delivered by the Chaplain of the Day. The constitutional delegates also negotiated over whether the preamble should refer to "Almighty God," the "Supreme Being," or "Almighty God for Liberty." *Records, supra,* at 41, 77, 82–83. They ultimately agreed that the preamble should read, "We, the people of the State of Arizona, grateful to Almighty God for our liberties, do ordain this Constitution." *Id.* at 1399.

¶ 59 In a more contemporary vein, tax codes, both state and federal, permit churches and other religious institutions to acquire tax-free status and allow deductions for contributions made directly to such entities. *See* 26 U.S.C. §§ 501(a), (c)(3), 170(a), (c)(2)(B); A.R.S. §§ 43–1201, 43–1042. "[T]he doctrine of separation of church and state does not include the doctrine of total nonrecognition of the church by the state and of the state by the church." *Community Council,* 102 Ariz. at 451, 432 P.2d at 463.

■ ¶ 60 Clearly, the state constitution forbids the creation of a state church or religion. It also guarantees freedom of worship and belief by demanding absolute neutrality in the treatment of religious groups. "The State is mandated by [article II, § 12] to be absolutely impartial when it comes to the question of religious preference, and public money or property may not be used to promote or favor any particular religious sect or denomination or religion generally." *Pratt v. Arizona Bd. of Regents,* 110 Ariz. 466, 468, 520 P.2d 514, 516 (1974). There is no evidence, however, that the framers intended to divorce completely any hint of religion from all conceivably state-related functions, nor would such a goal be realistically attainable in today's world.

¶ 61 We do know that the framers "took education seriously," as evidenced by their creation of a separate constitutional article on the subject. John D. Leshy, *The Making of the Arizona Constitution,* 20 Ariz. St. L.J. 1, 96 (1988). They expressed the belief that educated citizens are vital to a free and united society. *See Roosevelt Elementary Sch. Dist. No. 66 v. Bishop,* 179 Ariz. 233, 239, 877 P.2d 806, 812 (1994). Thus, Arizona compels its children to attend school—public, private, or home school. *See* A.R.S. § 15–802(A). We must respect the framers' intent in this area as we decide the present issue.

¶ 62 One of the most enviable attributes of our constitutional form of government is its adaptability to change and innovation. As stated in *Community Council,* we must view constitutional provisions "in light of contemporaneous assumptions." 102 Ariz. at 451, 432 P.2d at 463. Today's reality is that primary and secondary education systems are facing nationwide reform. Many states are exploring alternatives to traditional public education—from charter schools to private school vouchers. *See* Jo Ann Bodemer, Note, *School Choice Through Vouchers: Drawing Constitutional Lemon–Aid from the Lemon Test,* 70 St. John's L.Rev. 273, 275–77 (1996). In 1994, Arizona authorized the creation of charter schools supported by public funds. *See* A.R.S. §§ 15–181 through 15–189.02. In doing so, the legislature hoped to encourage the development of educational settings that would invigorate learning, improve academic achievement, and provide additional choices for parents and children. *See* A.R.S. § 15–181(A). It has now adopted a tax policy presumptively intended to further the same or similar goals. The pursuit of such a strategy falls squarely within the legislature's prerogative.

■ ¶ 63 Some might argue that the statute in question runs counter to these goals by encouraging more students to attend private schools, thereby weakening the state's public school system. But that is a matter for the legislature, as policy maker, to

debate and decide. It is not for us to pass on the wisdom of this or any other social policy. Concerning ourselves only with matters of constitutionality, we have concluded that the religion clauses of the Arizona Constitution do not invalidate this attempt to keep pace with changing economic conditions and societal goals.

*Blaine Amendment and Washington State Constitution*

¶ 64 The dissent relies to a great extent on external, peripheral sources such as the Blaine amendment, introduced in Congress more than 100 years ago, and the Washington State Constitution. These do not control our decision today.

¶ 65 In 1875, Maine Congressman James Blaine introduced a Constitutional amendment prohibiting the states from granting public funds or taxes for the benefit of any religious sect or denomination. Joseph P. Viteritti, *Choosing Equality: Religious Freedom and Educational Opportunity Under Constitutional Federalism*, 15 Yale L. & Pol'y Rev. 113, 144 (1996). The bill failed to muster enough votes for passage, but was later resurrected in a number of state constitutions. *Id.* at 146–47.

¶ 66 The Blaine amendment was a clear manifestation of religious bigotry, part of a crusade manufactured by the contemporary Protestant establishment to counter what was perceived as a growing "Catholic menace." Viteritti, *supra*, at 146; *see also* Stephen K. Green, *The Blaine Amendment Reconsidered*, 36 Am. J. Legal Hist. 38, 54 (1992). Its supporters were neither shy nor secretive about their motives. As one national publication which supported the measure wrote:

> Mr. Blaine did, indeed bring forward . . . a Constitutional amendment directed against the Catholics, but the anti-Catholic excitement was, as every one knows now, a mere flurry; and all that Mr. Blaine means to do or can do with his amendment is, not to pass it but to use it in the campaign to catch anti-Catholic votes.

Green, *supra*, at 54 (quoting *The Nation*, Mar. 16, 1876, at 173). Other contemporary sources labeled the amendment part of a plan to "institute a general war against the Catholic Church." Green, *supra*, at 44 (quoting *The New York Tribune*, July 8, 1875, at 4). While such efforts were unsuccessful at the federal level, the jingoist banner persisted in some states. By 1890, twenty-nine states had incorporated at least some language reminiscent of the Blaine amendment in their own constitutions. Viteritti, *supra*, at 147. There is, however, no recorded history directly linking the amendment with Arizona's constitutional convention. In our judgment, it requires significant speculation to discern such a connection. In any event, we would be hard pressed to divorce the amendment's language from the insidious discriminatory intent that prompted it.

¶ 67 The Arizona constitutional convention consumed a mere two months from beginning to end. Leshy, *supra*, at 40–41. As one of the last states admitted to the Union, Arizona borrowed much from those that preceded it. *See* Leshy, *supra*, at 5. Language was lifted from the constitutions of Washington, Oregon, Texas, and Oklahoma, to name a few. *See, e.g., Records, supra*, at 167, 179, 182, 660.

¶ 68 On several occasions we have acknowledged similarities between provisions of the Washington Constitution and our own. *See Schultz v. City of Phoenix*, 18 Ariz. 35, 42, 156 P. 75, 77 (1916); *Faires v. Frohmiller*, 49 Ariz. 366, 372, 67 P.2d 470, 472 (1937). Nevertheless, while Washington's judicial decisions may prove useful, they certainly do not control Arizona law. We alone must decide how persuasive the legal opinions of other jurisdictions will be to our holdings. *See Desert Waters, Inc. v. Superior Court*, 91 Ariz. 163, 167–68, 370 P.2d 652, 655 (1962) (noting that while a certain provision of Washington's constitution was "identical" to Arizona's, "it becomes apparent that the same meaning and effect was not intended by its adoption"). At least thirty states have constitutions that contain provisions similar to one or both of our religion clauses.[10] To our knowledge, none of these juris-

10. *See* Alaska Const. art. VII, § 1; Cal. Const. art. XVI, § 5; Colo. Const. art. IX, § 7; Del.

dictions has faced the precise issue before us today.

¶ 69 The dissent points to three Washington State cases holding that state money could not be used to provide financial assistance to students. *See Witters v. Washington Comm'n for the Blind,* 112 Wash.2d 363, 771 P.2d 1119 (1989) (direct financial aid for visually impaired student to pursue religious studies at private bible college); *Washington State Higher Educ. Assistance Auth. v. Graham,* 84 Wash.2d 813, 529 P.2d 1051 (1974) (state agency purchasing and making loans to students in post-secondary educational institutions); *Weiss v. Bruno,* 82 Wash.2d 199, 509 P.2d 973 (1973) (direct financial assistance to students attending both public and private elementary and high schools, as well as private colleges and universities). In each instance, the Washington Supreme Court found that the program violated the state's constitutional prohibitions against using public money to benefit sectarian schools. While these cases are informative, they are also distinguishable on their facts. In each instance, direct appropriations of state monies were involved.

¶ 70 It is also important to recall that Arizona and Washington were founded under markedly different historical circumstances, and their subsequent development reflects those differences. It is difficult, if not impossible, to apply the intent of one group of constitutional framers to another operating at a different time and place. Thus, we must cautiously view the constitutional decisions of other state courts as we attempt to place our own founding document in historical perspective. As the now Chief Justice of the Wisconsin Supreme Court has so aptly said in describing her approach to constitutional interpretation: "I look at the peculiarities of my state—its land, its industry, its people, its history." Shirley S. Abrahamson, *Reincarnation of State Courts,* 36 Sw. L.J. 951, 965 (1982).

¶ 71 Washington State was carved from the British Northwest Territories, controlled by the large fur trading companies. Climate, geography and the abundance of natural resources—timber, fish, and water—are reflected in myriad ways in that state's governmental institutions and sources of economic power. The trans-Pacific influences are readily apparent to anyone who walks Seattle's waterfront or Chinatown. Arizona, in contrast, emerged from an entirely different orientation reaching from Spain and Mexico. Our founding documents are the Treaty of Guadalupe Hidalgo and the Gadsden Purchase. Our first settlers came looking for gold, silver, and copper, or range land for cattle. The economic, political, and social ramifications of the lack of a resource such as water can hardly be overestimated. In such vastly dissimilar milieus, even identical words can carry with them a freight of startlingly different meanings.

## CONCLUSION

¶ 72 We hold that the tuition tax credit is a neutral adjustment mechanism for equalizing tax burdens and encouraging educational expenditures. Petitioners have failed to demonstrate that it violates either the Federal or the Arizona Constitution. We find it a valid exercise of legislative prerogative. Relief denied.

JONES, V.C.J., and MARTONE, J., concur.

FELDMAN, Justice, dissenting.

¶ 73 Believing A.R.S. § 43–1089 (the Arizona tax credit) violates the explicit text of our state constitution and the Establishment Clause of the federal constitution, I respectfully dissent.

¶ 74 Today's decision upholding the use of a tax credit to support private and sectari-

Const. art. X, § 3; Fla. Const. art. I, § 3; Ga. Const. art. I, § 2, para. 7; Haw. Const. art. X, § 1; Idaho Const. art. IX, § 5; Ill. Const. art. X, § 3; Ind. Const. art. I, § 6; Mass. Const. amend. art. XVIII, § 2; Mich. Const. art. I, § 4; Minn. Const. art. I, § 16; Miss. Const. art. VIII, § 208; Mo. Const. art. IX, § 8; Mont. Const. art. X, § 6; Neb. Const. art. VII, § 11; N.H. Const. Pt. II, art. 83; N.Y. Const. art. XI, § 3; Okla. Const. art. II, § 5; Or. Const. art. I, § 5; Pa. Const. art. III, § 29; S.C. Const. art. XI, § 4; S.D. Const. art. VI, § 3; Tex. Const. art. I, § 7; Utah Const. arts. I, § 4 and X, § 9; Va. Const. art. IV, § 16; Wash. Const. art. I, § 11; Wis. Const. art. I, § 18; Wyo. Const. art. I, § 19.

an schools is unfortunate in several respects. First, the court allows the government to provide assistance to private, predominantly sectarian schools despite a clear prohibition in article II, § 12 and article IX, § 10 of the Arizona Constitution. Next, it overlooks the historical background of these sections and consequently ignores the framers' plain intent. It then confuses non-neutral, direct tax credits with neutral deductions and benefits when there is, in fact, a clear difference in their constitutionality. Fourth, it errs in suggesting that funds derived from tax credits are not public funds. Finally, because the statute permits uncontrolled, government-reimbursed grants to private, primarily religious institutions and denies similar grants to public institutions, it directly subsidizes religious education and thus violates the Establishment Clause of the First Amendment to the United States Constitution.

## THE ARIZONA TAX CREDIT PLAN

¶ 75 This case does not deal with or question reference to the deity in the state's seal or preamble to the constitution. Nor does it deal with public or charter schools, voucher programs providing educational aid to low-income families, or even charitable contributions. Constitutionality in this case, as in most, turns on analysis of statutory purpose and effect. The Arizona tax credit does not survive this analysis. The tax credit statute permits any taxpayer, not just parents of school children, a $500 direct credit against taxes, but only to reimburse so-called contributions to school tuition organizations (STOs) supporting nongovernmental schools. At least seventy-two percent of these schools are sectarian. *See* Coffey, A Survey of Arizona Private Schools (1993) (Appendix I of Intervenor Lisa Graham Keegan, Arizona Superintendent of Public Instruction). Contributions to public schools will not qualify for the credit because a "qualified school" is limited to "a *nongovernmental* primary or secondary school" of the "parents' choice." § 43–1089(E)(1), (2) (emphasis added).

¶ 76 It is true the public school system is tuition-free and students at those schools therefore need no scholarships or tuition grants, but provisions could have been made for a tax credit for contributions supporting the educational mission of the public school system. This would have put the state's private, sectarian, and public schools on the same basis. But § 43–1089.01 allows only a maximum $200 credit for contributions to public schools and is available only to reimburse fees paid for extracurricular activities. The majority intimates that comparison of the two school credits is "unnecessary" to the analysis because the costs of public school establishment and operation are already borne by the state. Op. at ¶ 25. The problem with that argument is apparent from reading our own opinions on the deficiencies of state financing of public schools and the underfinanced and unfilled educational missions of those schools. *See, e.g., Roosevelt Elem. Sch. Dist. v. Bishop*, 179 Ariz. 233, 877 P.2d 806 (1994). If we are to consider equality or neutrality of the two credits, we must bear in mind that public schools, like private schools, need assistance to perform their educational mission.

¶ 77 Notably, the private school tax credit does not restrict use of the grant money to secular purposes. Thus, the recipient schools may use the government's subsidy for direct support of sectarian education or observance, the very thing both our state and federal constitutions forbid. Further, while prohibiting the STOs from making grants to "only students of one school," the statute does not prevent an STO from directing all of its grant money to a group of schools that restrict enrollment or education to a particular religion or sect. § 43–1089(E)(2). In fact, a group of taxpayers who subscribe to a particular religion may form an STO that will support only schools of that religion. Worse, in defining the schools qualified to receive STO grants, the Legislature excluded schools that "discriminate on the basis of race, color, sex, handicap, familial status, or national origin" but not those that limit admission on the basis of religious adherence, preference, or observance. § 43–1089(E)(1). Indeed, STOs are to use the grant money to "allow" children to "attend any qualified school of their parents' choice." § 43–1089(E)(2). Thus, nothing forbids an STO from limiting its grants or scholarships to students who ad-

here to a particular religion and will participate in the required religious observance.

¶ 78 There is, of course, nothing bad and everything good in private support for religious schools and sectarian education. But both state and federal constitutions forbid using the power of government to provide the type of support encompassed by Arizona's statute. I turn first to the federal constitution.

## THE FEDERAL CONSTITUTION

¶ 79 The majority believes the standard of *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), provides an appropriate framework for its review of the constitutionality of § 43–1089. Op. at ¶ 5. The second prong of *Lemon's* three-part test requires that a statute be "neutral on its face and in its application" and not have the "primary effect" of advancing sectarian aims of nonpublic schools. *See Mueller v. Allen*, 463 U.S. 388, 392, 103 S.Ct. 3062, 3065, 77 L.Ed.2d 721 (1983); *see also Committee for Pub. Educ. & Religious Liberty v. Nyquist*, 413 U.S. 756, 788, 93 S.Ct. 2955, 2973, 37 L.Ed.2d 948 (1973). To comply, "aid to sectarian schools must be restricted to ensure that it may not be used to further the religious mission of those [religious] schools." *See Mueller*, 463 U.S. at 406, 103 S.Ct. at 3073 (citing *Wolman v. Walter*, 433 U.S. 229, 250–51, 97 S.Ct. 2593, 2606–07, 53 L.Ed.2d 714 (1977)). I believe § 43–1089 fails this analysis.

### A. The primary effect of A.R.S. § 43–1089 is not neutral

¶ 80 The Establishment Clause issue turns on the United States Supreme Court's opinions in *Nyquist* and *Mueller*. Arizona's tax credit contains each of the factors that led the Court to declare the credit unconstitutional in *Nyquist* and none of the provisions that saved the deduction in *Mueller*.

¶ 81 The New York plan considered in *Nyquist* involved a tuition grant program for low income families, together with a tuition tax deduction program that varied by income level. Both plans were limited to families whose children attended private schools; nei-

ther program was available for parents of children who attended public schools.

¶ 82 The Court noted that the private schools were predominantly religious and concluded that both tuition aid programs violated the Establishment Clause.

> [When] grants are offered as an incentive to parents to send their children to sectarian schools by making unrestricted cash payments to them, the Establishment Clause is violated whether or not the actual dollars given eventually find their way into the sectarian institutions. Whether the grant is labeled a reimbursement, a reward, or a subsidy, its substantive impact is still the same.

413 U.S. at 786, 93 S.Ct. at 2972.

¶ 83 In *Nyquist*, New York issued vouchers redeemable only at private schools. Arizona's tax credit is available only for private school contributions. The result is state support of private, mostly sectarian schools. And contrary to the majority's assertion, it is not affected even though the "final destination" of the money is chosen by "individual parents," not the state. Op. at ¶ 19. In New York, the funds went first to the parents and then to the school of their choice. *Id.* at 785–86, 93 S.Ct. at 2972. Similarly, under the Arizona plan, the money goes first to the STO and then to the school of its choice. In a footnote, the *Nyquist* Court made it clear that the result might be different if the scholarships and tuition grants were neutrally "available without regard to the sectarian-nonsectarian, or public-nonpublic nature of the institution benefitted." 413 U.S. at 782 n. 38, 93 S.Ct. at 2970 n. 38. Arizona's tax credit, however, may be used only at private, mostly sectarian schools.

¶ 84 In *Mueller*, the Court upheld a Minnesota law allowing a deduction, in part because it was "available for educational expenses incurred by all parents including those whose children attend public schools." Making the benefit available to this neutral and "broad class" is an "important index of secular effect." 463 U.S. at 397, 103 S.Ct. at 3068 (quoting *Widmar v. Vincent*, 454 U.S. 263, 274, 102 S.Ct. 269, 277, 70 L.Ed.2d 440 (1981)). The Court said the Establishment Clause does "not encompass the sort of at-

tenuated financial benefit ... that eventually flows to parochial schools from the neutrally available tax benefit at issue...." *Id.* at 400, 103 S.Ct. at 3070. Indeed, the *Mueller* Court described *Nyquist*'s unconstitutional, nonneutral, private school program in words directly applicable to the Arizona: "thinly disguised 'tax benefits,' actually amounting to tuition grants, to the parents of children attending private schools," the majority of which were sectarian. *Id.* at 394, 103 S.Ct. at 3066.

¶ 85 This case is very like *Nyquist* and very unlike *Mueller.* The Arizona tax credit is available only to those who choose to support private, predominantly religious schools. Those who wish to contribute to public schools are allowed only a $200 credit, and their contributions can be used only to reimburse fees paid for extracurricular activities. Thus, the tax credit does not offer the same or even similar benefits to all taxpayers, is not neutral, and the "money involved represents a charge made upon the state for the purpose of religious education." *Nyquist,* 413 U.S. at 791, 93 S.Ct. at 2974.

**B. The tax credit is not one of a group of permissible, generally available tax benefits**

¶ 86 The majority argues that "both credits and deductions ... are intended to serve policy goals, and clearly act to induce 'socially beneficial behavior' by taxpayers." Op. at ¶ 12 (quoting Elizabeth A. Baergen, Note, *Tuition Tax Deductions and Credits in Light of Mueller v. Allen,* 31 WAYNE L. REV. 157, 173 (1984)). The court goes on to say there are "mechanical differences between deductions and credits," but "that these distinctions are [not] constitutionally significant." *Id.*

¶ 87 I fear the court conflates personal philanthropy with government grants. The difference is one of substance, not mechanics or labels. Unlike deductions allowed for general charitable giving, the tax credit provides a dollar-for-dollar reimbursement available only to those who support our primarily sectarian private school system. It is everything *Nyquist* held unconstitutional—a direct stipend that has the primary effect of advancing religion by tuition grants to religious

schools. *Nyquist,* 413 U.S. at 779–80, 791, 93 S.Ct. at 2969, 2974–75.

¶ 88 The court sees this quite benignly, as just one of the "tools by which government can ameliorate the tax burden while implementing social and economic goals." Op. at ¶ 15. But the Establishment Clause forbids the government from promoting religious education by special benefits unavailable for general, charitable giving. This, of course, includes tax subsidies available only for religious education. *Nyquist,* 413 U.S. at 782–83, 93 S.Ct. at 2970–71; *see also Witters v. Washington Dep't of Serv. for the Blind,* 474 U.S. 481, 487–88, 106 S.Ct. 748, 751, 88 L.Ed.2d 846 (1986) (discussing impermissible direct subsidies to religious education). As the Court recognized in *Nyquist*'s companion case, a statute that implicates the Establishment Clause cannot *"single[ ] out a class of its citizens for a special economic benefit." Sloan v. Lemon,* 413 U.S. 825, 832, 93 S.Ct. 2982, 2986, 37 L.Ed.2d 939 (1973). When such a benefit acts as a tuition subsidy that helps only children attending primarily sectarian schools, it supports religiously oriented institutions. *Id.*

¶ 89 Thus, in arguing that the Arizona tax credit is but one of many tax credits provided by the Arizona Legislature, the court overlooks this crucial distinction: the Establishment Clause is not implicated when the Legislature grants tax credits to support socially beneficial programs such as environmental cleanups or assistance to the working poor. Op. at ¶ 15; *see also* §§ 43–1086, 43–1088. If it wished, the Legislature could, without constitutional conflict, make direct appropriations for these purposes. But credits that support religious education implicate the religion clauses of both the state and federal constitutions. *Illinois ex rel. McCollum v. Board of Educ.,* 333 U.S. 203, 218–19, 68 S.Ct. 461, 468–69, 92 L.Ed. 649 (1948). And when the tax credit is available only for support of private, predominantly religious schools, the Establishment Clause is not just implicated, it is violated. *Nyquist,* 413 U.S. at 793, 93 S.Ct. at 2975.

**C. There is no real private choice—religious institutions primarily benefit**

¶ 90 The court argues that the decision to contribute is purely a matter of individual choice and that religious institutions are only "incidental beneficiaries." Op. at ¶ 26. Under the provision upheld in *Mueller*, religious schools benefitted only as a result of true choice made among a *wide selection of alternatives*, both public and private. 463 U.S. at 397–99, 103 S.Ct. at 3068–69. Under the Arizona plan, there is no real choice—one may contribute up to $500 to support private schools or pay the same amount to the Arizona Department of Revenue. In reality, this is not a choice but government action designed to induce taxpayers to direct financial support to predominantly religious schools. The majority seems to argue that the "primary beneficiaries" of STO contributions are "scholarship recipients," not the schools. Op. at ¶ 21 n. 4. No doubt the STOs, the students, the schools, and those taxpayers wishing to support private schools are all beneficiaries. The question, however, is not who is a primary beneficiary but whether the state may subsidize private, secular education, thus benefitting any or all of these beneficiaries.

¶ 91 The Supreme Court has assessed a law's effect by examining the character of the institutions benefited to determine whether they are predominantly religious. *See, e.g., Meek v. Pittenger*, 421 U.S. 349, 363–64, 95 S.Ct. 1753, 1762–63, 44 L.Ed.2d 217 (1975). As the majority indicates, the *Mueller* Court voiced concern over whether statistics could be used to determine whether legislation will have a predominantly religious effect. 463 U.S. at 401, 103 S.Ct. at 3070. But there is a big distinction between *Mueller* and the present case. Because the *Mueller* statute was facially neutral and available for support of both public and private schools, the Court chose not to examine statistics showing which taxpayers—those deducting for private school expenses or those deducting for public school expenses—actually took advantage of the tax benefit. *Id.* "We would be loath to adopt a rule grounding the constitutionality of a *facially neutral* law on annual reports reciting the extent of various classes of private citizens who claimed benefits under the law." *Id.* (emphasis added).

¶ 92 The Arizona statute is not facially neutral because its beneficiaries are supporters of Arizona's private schools, not parents who may take a deduction for either public or private school expenses. The Arizona tax credit, unlike that in *Mueller*, is not limited to helping all parents with school children but is available only to taxpayers willing to direct the money to private schools. When the benefit can flow only to private schools, the court must determine what percentage of those private schools is sectarian. This is the precise statistic the Court examined in *Meek*, 421 U.S. at 364, 95 S.Ct. at 1762–63 (system seventy-five percent sectarian); *Nyquist*, 413 U.S. at 757, 93 S.Ct. at 2957 (eighty-five percent sectarian); *Sloan*, 413 U.S. at 830, 93 S.Ct. at 2985–86 (ninety percent sectarian); and *Lemon*, 403 U.S. at 610, 91 S.Ct. at 2110 (ninety-five percent sectarian).

¶ 93 In *Meek*, the Court described Pennsylvania's seventy-five percent sectarian private school system as "predominantly religious." 421 U.S. at 363, 95 S.Ct. at 1762. This phrase is, of course, applicable to Arizona's private, seventy-two percent sectarian schools. Thus, "it simply defies reason to say that such a statute does not aid sectarian schools." *Kosydar v. Wolman*, 353 F.Supp. 744, 762 (S.D.Ohio 1972), *aff'd sub nom. Grit v. Wolman*, 413 U.S. 901, 93 S.Ct. 3062, 37 L.Ed.2d 1021 (1973). Contrary to the majority's assertion, the statute promotes support of religious schools. It does this without prohibiting use for sectarian instruction, thereby allowing direct state subsidy of religious instruction and observance.

### D. A.R.S. § 43–1089 places no limitation on use of the tuition grants

¶ 94 The Establishment Clause is violated when state aid is directed exclusively to private, mostly sectarian schools *without limitation* on use. *See Nyquist*, 413 U.S. at 780, 93 S.Ct. at 2969; *Sloan*, 413 U.S. at 829, 93 S.Ct. at 2985; *Lemon*, 403 U.S. at 616–17, 91 S.Ct. at 2113–14; *see also Meek*, 421 U.S. at 365–66, 95 S.Ct. at 1763–64. The *Nyquist* Court held that *"[i]n the absence of an effective means of guaranteeing that the state aid derived from public funds will be used exclusively for secular, neutral, and nonideologi-*

*cal purposes, it is clear from our cases that direct aid in whatever form is invalid.*" 413 U.S. at 780, 93 S.Ct. at 2969 (emphasis added). *Mueller* did not disapprove that statement. In fact the Minnesota statute, unlike Arizona's, disallowed deductions for instructional books used to teach or "inculcate religious belief, tenets, doctrine, or worship." *Mueller*, 463 U.S. at 401, 103 S.Ct. at 3062. As the majority notes, *Mueller* can be construed to allow some types of unrestricted aid when neutrally available to both public and private schools, but the Court has never permitted unrestricted aid in a program, like Arizona's, available only to private, mostly sectarian schools. Instead, it has required mechanisms to restrict the aid to secular uses. LAWRENCE H. TRIBE, AMERICAN CONSTITUTIONAL LAW § 14–10, at 1226 (2d ed.1988). Those mechanisms are absent from the Arizona statute.

**E. The Arizona tax credit, unrestricted as to use, exceeds the boundaries set in the United States Supreme Court's Establishment Clause jurisprudence**

¶ 95 Because Arizona's tax credit statute does not require that grant use be restricted to the secular aspects of education, the STOs' grants to private schools may be used in any manner the recipient school wishes. Nor does the statute prevent an STO from directing all of its grant money to schools that restrict enrollment or education to adherents of a particular religion or sect. Moreover, there is no limit on the dollar amount the STO can give to a school on behalf of a student. Thus, an STO could pool several contributions and then pay the full tuition for any student, group of students, or for that matter, all students in any group of schools of a single religious faith.

¶ 96 None of the Court's cases permits such a government subsidy. The majority incorrectly relies on a number of cases that have built on *Mueller*. In *Witters*, for example, the benefit was used to provide vocational rehabilitation services for a blind student at a Christian college, but the benefit was equally available to any eligible student at any school, public or private. 474 U.S. at 488, 106 S.Ct. at 752.

¶ 97 In *Zobrest v. Catalina Foothills School District*, the Court approved a school district's provision of sign language interpreters under a federal act benefiting individuals with disabilities. 509 U.S. 1, 113 S.Ct. 2462, 125 L.Ed.2d 1 (1993). Thus, interpreters were available for deaf students attending classes at a Catholic high school, but also for students attending public schools. The Court held that the government had offered "a neutral service on the premises of a sectarian school as part of a general program that 'is no way skewed toward religion'...." *Id.* at 10, 113 S.Ct. at 2467.

¶ 98 In *Agostini v. Felton*, the Court held that grants for general remedial services available to aid the educational, nonreligious function of religious and public schools are not *per se* invalid. 521 U.S. 203, ——, 117 S.Ct. 1997, 2010, 138 L.Ed.2d 391 (1997). The Court relied on the principles established in *Nyquist* and *Mueller*: neutral government benefits do not violate the Establishment Clause when provided without regard to the sectarian-nonsectarian or publicnonpublic nature of the institutions supported. *Id.* at ——, 117 S.Ct. at 2011. The Arizona program, however, is available only to private schools and may be used for sectarian instruction and observance.

¶ 99 The majority today puts great reliance on the Wisconsin case of *Jackson v. Benson*, 218 Wis.2d 835, 578 N.W.2d 602, *cert. denied*, —— U.S. ——, 119 S.Ct. 466, —— L.Ed.2d —— (1998). Op. at ¶ 18. Even if we are to assume that *Jackson* will eventually withstand Establishment Clause analysis, it does not support the majority's result because the Wisconsin program is quite different from Arizona's. First, the Wisconsin statute contains an "opt-out" provision by which students may be excused from the religious aspects of sectarian education. Second, Wisconsin requires schools receiving grants to admit applicants without regard to religious/nonreligious preference. Third, Wisconsin limits support to the private institution's educational programs. Finally, Wisconsin's program is designed to help low income families send their children to private schools.

¶ 100 Arizona's statute, on the other hand, contains no religious instruction opt-out provision, appears to permit religious discrimination, permits funding of religious observance, and makes the tax credit available to all taxpayers, those who have children in school and those who do not, the rich and the poor. Further, our statute makes no limitation on the amount of funding a school can receive from an STO for a particular student. Wisconsin, in short, has made some attempt, successful or not, to limit the use of state subsidies for religious instruction and ceremony. Arizona's program, on the other hand, will inevitably and primarily benefit religious observance and instruction.

¶ 101 The majority has cited Professor Baergen's article for several points. *See, e.g.,* Op. at ¶¶ 12, 15. Professor Baergen's conclusion, however, provides a good summation for the Establishment Clause issue:

> Mueller v. Allen held that facially neutral income tax deductions for educational expenses are not an unconstitutional infringement of the Establishment Clause. This note suggests that tax credit provisions, which could entirely subsidize private sectarian education, should be carefully scrutinized for an unconstitutional legislative purpose. Such an *impermissible purpose should be found if the credit is limited to private educational expenses* or if the credit gives such an unbalanced benefit to the parents of private school children that it is clearly intended as a tax incentive to subsidize private, primarily sectarian education. Likewise, *a credit limited to private school expenses would suffer an unconstitutional primary effect of advancing religious education, unmitigated by the deference shown by courts to true legislative tax enactments [such as deductions]* which equitably allocate tax burdens based upon a definition of net income. Moreover, tax credit provisions which are facially neutral but only supply a [*de minimis* ] benefit to parents of public school children should be subject to statistical analysis to determine the true beneficiaries of the program and expose the facial neutrality as a facade.

Baergen, *supra,* 31 WAYNE L. REV. at 184 (emphasis added).

## THE STATE CONSTITUTION

### A. Historical background

¶ 102 The Arizona tax credit violates the state constitution's prohibition that "[n]o public money ... shall be applied to any religious worship, exercise, or instruction or to the support of any religious establishment." Article II, § 12. It also violates the prohibition on laying any "tax ... in aid of any ... private or sectarian school...." Article IX, § 10. The text is clear and unambiguous. Thus, the case should have ended there. But for those who somehow find ambiguity in the quoted words, we can turn to the intent of those who wrote our constitution.

¶ 103 The majority says we should use great "skepticism" in divining the framers' intent. Op. at ¶ 54. We are to look instead for the framers' "larger purposes." Op. at ¶ 55. But this court has always prided itself on its devotion to text and framers' intent. *E.g., Fain Land & Cattle Co. v. Hassell,* 163 Ariz. 587, 595, 790 P.2d 242, 250 (1990) ("The cardinal rule ... is to follow the text and the intent of the framers...."). Putting aside the explicit text, I believe the framers' intent is quite plain, even to our contemporary understanding, and their larger purposes quite apparent from a closer look at state history and the text of the relevant constitutional clauses.

¶ 104 The authors of the Arizona Constitution did not adopt the religion clauses in a historical vacuum. Article II, § 12 and article IX, § 10 were the product of contemporary social forces and a national and local battle over separation of church and state in public school instruction. The people who formed this state attempted to save us from religious bigotry by separating religion from state funding and support through our explicit religion clauses.

#### 1. The national scene

¶ 105 In the nineteenth century atmosphere, before the Establishment Clause applied to the states, the emerging public

schools commonly included explicit religious instruction. The religious make-up of the United States was predominantly Protestant, and public school instruction reflected this majority religion. The latter half of the nineteenth century, however, witnessed large Catholic immigration into the United States. Catholic church leaders resisted the open Protestantism that pervaded public school curriculum. As Catholic political power grew, so did efforts to secure state aid to parochial schools. At the same time, Protestants sought to "preserve the [Protestant] religious aspects of the public school curriculum and to protect the common culture from the growing Catholic menace. The Blaine Amendment was a product of that sentiment." Joseph P. Viteritti, *Choosing Equality: Religious Freedom and Educational Opportunity Under Constitutional Federalism*, 15 YALE L. & POL'Y REV. 113, 145–46 (1996).

¶ 106 These education-related contests between Protestants and Catholics led to calls for stringent separation of church and state in education finance. President Grant took up the cause in an 1875 address to the Army of Tennessee:

> Let us then begin by guarding against every enemy threatening this perpetuity of free republican institutions.... *The free school is the promoter of that intelligence which is to preserve us.* ... Let us all ... *[e]ncourage free schools and resolve that not one dollar appropriated for their support shall be appropriated to the support of any sectarian schools.* Resolve that either the state or the nation, or both combined, shall support institutions of learning sufficient to afford to every child growing up in the land the opportunity of a good common school education, unmixed with sectarian, pagan, or atheistical dogmas. *Leave the matter of religion to the family circle, the church, and the private school supported entirely by private contributions. Keep the church and state forever separate.*

CONRAD HENRY MOEHLMAN, THE AMERICAN CONSTITUTIONS AND RELIGION 16 (1938) (emphasis in original). In his next message to Congress, President Grant recommended a constitutional amendment to preclude state funding of private (Catholic) schools, while permitting continued Protestant influence in the public schools via reading of the King James Bible. The proposal, named after its sponsor, Rep. John Blaine, became known as the Blaine Amendment.

¶ 107 As passed by the House of Representatives, the amendment provided, *inter alia*, that "no money raised by taxation in any state, *for the support of the public schools or derived from any public fund therefor*, shall ever be under the control of any religious sect...." One of the Senate's principal objections to the amendment was that it "would only forbid *school* funds [from aiding religion and denominational schools]; it would not prohibit the States from using any other public funds for religion or sectarian schools. To block *every avenue*, the Senators wrote several new strictures into the House project." William O'Brien, *The States and "No Establishment": Proposed Amendments to the Constitution Since 1798*, 4 WASHBURN L. REV. 183, 193 (1965) (second emphasis added; cites to Congressional Record omitted). As a result, the version of the Blaine Amendment that narrowly failed to receive Senate approval read:

> No State shall make any law respecting an establishment of religion or prohibiting the free exercise thereof; and no religious test shall ever be required as a qualification to any office or public trust under any State. *No public property, and no public revenue* of, nor any loan of credit by *or under the authority* of, the United States, *or any State, Territory*, District, or municipal corporation, *shall be appropriated to, or made or used for, the support of any school, educational or other institution, under the control of any religious or antireligious sect, organization, or denomination*, or wherein the particular creed or tenets shall be read or taught in any school or institution supported in whole or in part by such revenue or loan of credit; *and no such appropriation or loan of credit shall be made to any religious or anti-religious sect, organization, or denomination or to promote its interests or tenets.* This article shall not be construed to prohibit the

reading of the Bible in any school or institution.

MOEHLMAN, *supra*, at 17 (emphasis added).

¶ 108 While the Blaine Amendment, and similar proposals,[11] failed in Congress, it ultimately met with considerable success in the states. Between 1877 and 1917, its language was adopted in whole or in part in twenty-nine state constitutions. Ann Marlow Grabiel, Comment, *Minnesota Public Money and Religious Schools: Clearing the Federal and State Constitutional Hurdles*, 17 HAMLINE L. REV. 203, 223 (1993). Ironically, however, the anti-Catholic bigotry that inspired the Blaine Amendment was displaced in many of those states by a principled commitment to strict separation between church and state in education. "It is one of the great ironies of American constitutional history that the Blaine Amendment, which erupted out of a spirit of religious bigotry and a politics that sought to promote Protestantism in public schools, eventually became an emblem of religious freedom in some states." Viteritti, *supra*, 15 YALE L. & POL'Y REV. at 147. Arizona was one of those states.

## 2. The Arizona scene

¶ 109 Arizona's Blaine Amendment clauses contain a stringent proscription on educational aid, forbidding state aid to all private schools, sectarian or secular. *See* JOHN D. LESHY, THE ARIZONA STATE CONSTITUTION: A REFERENCE GUIDE 216 (1993)(our article IX, § 10 "is a more targeted (and potentially more stringent) specification of the prohibition against subsidies to private entities"); Linda S. Wendtland, Note, *Beyond the Establishment Clause: Enforcing Separation of Church and State Through State Constitutional Provisions*, 71 VA. L. REV. 625, 633 (1985). The history of Arizona public schools and the pertinent legislation leading up to the constitutional convention confirm that the strict language of our constitution emerged from the framers' firm conviction that the

state should be absolutely prohibited from subsidizing any form of sectarian education—a conclusion drawn from the framers' territorial experience.

¶ 110 In 1864, the territory's First Legislative Assembly established a publicly funded common school system. *See* chapter XXIII, § 11, The Howell Code (1864). Ironically, the first school appropriation was an 1866 grant of $250 to the mission school at San Xavier. JAY J. WAGONER, ARIZONA TERRITORY, 1863–1912: A POLITICAL HISTORY 51 (Tucson 1970). In the following decade, however, the national battle over public funding for sectarian schools hit Arizona's emerging public education system, and Arizona forged a clear path toward separation by prohibiting state aid to sectarian education.

¶ 111 In light of the large Mexican-American, predominantly Catholic population of the territory, the possibility of public funding for Catholic schools would have had a substantial impact. *See* Samuel Pressly McCrea, *Establishment of the Arizona School System, in* BIENNIAL REPORT OF THE SUPERINTENDENT OF PUBLIC INSTRUCTION OF THE TERRITORY OF ARIZONA, FOR THE YEARS ENDING JUNE 30, 1907 AND JUNE 30, 1908, at 95 (1908). Governor A.P.K. Safford, known as the father of Arizona education, expressed early concern that sectarian, primarily Catholic, schools would attract public moneys for their support. McCrea, *supra, in* BIENNIAL REPORT, at 96. The Legislative Assembly apparently shared Governor Safford's concern and in 1871 sought to prevent such a result by enacting a prohibition against use of sectarian books or other documents and teaching of "sectarian or denominational doctrine" in Arizona's public schools. Any school in which such sectarian or denominational doctrine had been taught could not receive public school funds. Act to Establish Public Schools in the Territory of Arizona § 34 (approved Feb. 18, 1871).

---

11. Several congressmen continued to propose similar constitutional amendments through 1888. *See* Frank J. Conklin & James M. Vache, *The Establishment Clause and the Free Exercise Clause of the Washington Constitution: A Proposal to the Supreme Court*, 8 U. PUGET SOUND L. REV.

411, 433 n. 115 (1985). From 1889 on, the Blaine agenda was advanced in Congress by inserting requirements in the enabling acts for prospective states that church/state separation clauses be included in the constitutions of newly admitted states. *See id.* at 433.

¶ 112 In a report to the Federal Commissioner on Education, Governor Safford explained and endorsed the logic of such a provision:

> To the end that children of every religious faith may consistently attend these schools, the legislature wisely prohibited the use of sectarian books and religious teaching in them. Therein children of parents of any and every faith can meet in harmony and upon an equality in all respects. Based upon any other character of law, the free-school-system would and should soon be destroyed. Were one religious doctrine taught, children of other religious doctrines would surely be driven from the schools. In this age of science, learning, and religious and political independence, it will not do to promote any sect at the common expense. The funds which maintain the grand free schools are drawn from people of every creed, and it is but just that all shall be equally benefited, without the least attempt to inculcate any of the many religious beliefs. Religious instruction peculiarly belongs to the family-circle and church. The most cruel and bloody wars recorded in the pages of history show that they were the offspring of the intolerance of religious sects. Bigotry has brought untold thousands of innocent men and women to torture and death. The cloak of religion has been used to cover dire crimes against mankind; but happily for poor and rich of all beliefs and conditions, the time for such cruel intolerance has passed away. Under the benign influences of our free Republic, every one has and can exercise the inalienable right, free from threats and oppression, to worship God in his own way; and our public schools constitute the safe foundation upon which the prosperity and endurance of our beloved country rest and our rightful liberties are secured and assured. In the public-school-room the children of every creed are gathered, not to despise and hate each other, as in olden times, under sectarian teaching, but to love and respect manly and womanly virtues wherever or in whomsoever found, regardless of the faith one or the other entertains.

Report of Hon. A.P.K. Safford, in REPORT OF THE COMMISSIONER OF EDUCATION FOR THE YEAR 1873, at 426–27 (G.P.O.1874).

¶ 113 The 1871 act was also the first to provide for a general or territorial tax to support schools. WAGONER, *supra,* at 106. Section 32 stated: "No portion of the public school funds, whether derived from Territorial, county or district taxation, shall be used or appropriated to any other than school purposes." Yet in a separate act, the 1871 Legislative Assembly appropriated $300 from the general fund to the Sisters of St. Joseph of Tucson to reimburse them for school books purchased.[12] This appropriation, which was renewed by the 1873 Legislative Assembly, was apparently not paid because the territorial treasurer believed payment would be illegal. But in 1875, the Legislative Assembly ordered it paid from the Territory's general fund. McCrea, *supra,* in BIENNIAL REPORT, at 88.

¶ 114 This 1875 payment, coupled with the Catholic community's apparent boycott of fundraising efforts on behalf of the public schools, set off a wave of debate on the issue of state funding of private religious institutions. *See* John C. Bury, Dissertation, *The Historical Role of Arizona's Superintendent of Public Instruction* 114–29 (Northern Arizona University 1974). The cause for public support of Catholic schools was championed by Chief Justice Edmund Dunne of the Arizona Territorial Supreme Court. He argued before the 1875 Legislative Assembly that either Catholics whose children attended private, sectarian schools should be exempt from paying taxes to support public schools or public moneys should be used to support Catholic schools. *Id.* at 117–18. He sought to enforce his vision of state-funded Catholic schools by asking the Assembly to create corporations that would establish private schools. These corporations would then receive tax funds based on the number of enrolled students in their schools. *Id.* The

---

12. In 1871, St. Joseph's Academy, a private girls' school, was the only school operating in Tucson. The first public school did not open until 1872. WAGONER, *supra,* at 70, 107.

measure was ultimately defeated,[13] and Chief Justice Dunne was relieved of his position by the federal government. *Id.* at 119–20, 124.

¶ 115 Governor Safford remained publicly silent on the issue until after the Legislative Assembly settled it in favor of nonsectarian instruction. In his 1877 message to the Legislative Assembly, Governor Safford recounted the achievements of the nascent Arizona public schools and strongly argued for continuing nonsectarian instruction and limiting expenditure of public school funds to support of public schools:

> The school room is peculiarly an American institution. It is organized and kept free from sectarian or political influences. . . . *To surrender this [public school] system, and yield to a division of the school fund upon sectarian grounds, could only result in the destruction of the general plan for the education of the masses, and would lead, as it always has wherever tried, to the education of the few and the ignorance of the many.* This proposition is so self-evident, and experience has proved it so true, that it does not require argument.

Journal of the Ninth Legislative Assembly, at 32 (1877) (emphasis added).

¶ 116 Resolution of the 1875 school controversy was not, however, the final legislative word on sectarian influence in the public schools. In 1885, the Legislative Assembly revised the school laws to provide far more stringent protections. The first change was to amend the earlier proscription on sectarian instruction to read:

> No books, tracts or papers of a sectarian character shall be used in, or introduced into any school established under the provisions of this act, nor shall any sectarian doctrine be taught therein, *nor shall any school whatever under the control of any religious denomination, or which has not been taught in accordance with the provisions of this act, receive any of the public school funds, and upon satisfactory evidence of such violation the county school superintendent must withhold all apportionments of school moneys from said school.*

Act to Establish a Public School System and to provide for the maintenance and supervision of Public Schools in the Territory of Arizona § 84 (approved March 12, 1885) (emphasis added).

¶ 117 While this first amendment did little more than strengthen the existing proscription on sectarian influence in the public schools, a second legislative measure distinguished Arizona from the anti-Catholic bigotry pervading most of the nation on the church/school question. In contrast to the Blaine Amendment and constitutional amendments in states that discriminated against Catholics and promoted Protestantism through reading the King James Bible in schools, Arizona legislated against *all religious exercise:*

> Any teacher who shall *use any sectarian or denominational books or teach any sectarian doctrine, or conduct any religious exercises* in his school, or who shall fail to comply with any of the provisions mentioned in section 89 of this act, shall be deemed guilty of unprofessional conduct, and it shall be the duty of the proper authority to revoke his or her certificate, or diploma.

*Id.* § 93 (emphasis added). As noted in a United States Bureau of Education Report on Public School Education in Arizona:

> Every school law since that of 1871 had contained provisions against the introduction of tracts or papers of a sectarian character into the public school, also against the teaching of any sectarian doctrine in them. For some reason this was not believed to be drastic enough, and a section was added to the law which provided for revoking teachers' certificates for using in their schools sectarian or denominational books, for teaching in them any

---

**13.** According to McCrea, when Arizona decided against public support of private sectarian education it "then and there parted from New Mexico in educational policy." McCrea, *supra, in* Biennial Report, at 96. The contrast with New Mexico is as striking as it is illuminating. In New Mexico, the Catholic Church dominated education, and attempts to secularize the schools via the 1889 draft constitution were in large part responsible for the failure to ratify that constitution. *See* Robert W. Larson, New Mexico's Quest for Statehood 1846–1912, at 125, 159–68 (1968).

sectarian doctrine, or for conducting any religious exercise therein. The lawmakers evidently aimed to relegate all religious teaching to the home and the church. *The prohibiting of "religious exercises" in schools has met with strong condemnation from many Protestant church members, but with the variety of religious creeds represented in the Territory it is doubtful whether a better policy could have been found.*

STEPHEN B. WEEKS, UNITED STATES BUREAU OF EDUCATION, HISTORY OF PUBLIC SCHOOL EDUCATION IN ARIZONA 55 (Bulletin No. 17, 1918) (quoting McCrea, *supra,* in BIENNIAL REPORT, at 121–22) (emphasis added). Thus, by 1885 Arizona had firmly demonstrated its commitment to the separation of church and state in education. Moreover, it had radically distinguished itself from most of the rest of the nation by extending its separationist commitment to preclude Protestant, Catholic, and all other religious influence in its public schools.

¶ 118 Arizona's continued commitment to church/state separation in education was next evinced in the 1891 Draft Constitution proposed as part of the statehood movement. Article VIII, § 3 stated:

*All common schools, universities and other educational institutions,* for the support of which lands have been granted to the State, or *which are supported by a public tax, shall remain under the absolute and exclusive control of the State, and no money raised for the support of the public schools of the State shall be appropriated or used for the support of any educational institution, wholly, or in part, under sectarian or ecclesiastical control.* No religious test or qualification shall ever be required of any person as a condition of admission into any public educational institution of the State, either as teacher or student. No sectarian or religious tenets or doctrines shall ever be taught in the public schools, nor shall any books, papers, tracts, or documents of a political, sectarian or denominational character be used or introduced in any school established under the provisions of this Article.

Notably, the latter portion is copied practically verbatim from Arizona's longstanding legislation on the subject.

### 3. The 1910 constitutional convention

¶ 119 Unless we assume our convention delegates lived in isolation from the issues of the day and were ignorant of their recent past, the foregoing leaves little doubt about the separationist intent of the framers of article II, § 12 and article IX, § 10. We need not, however, infer the intent of those proscriptions solely from the history leading up to the convention. The events surrounding their enactment speak directly to the question.

¶ 120 The substance of the Arizona Constitution, like that of numerous other state constitutions, was not entirely under the framers' control. Arizona's admission into the Union was authorized by a federal enabling act. *See* 36 U.S. Stat. 568–79 (1910). Strict separation of church and state continued to be important to Congress at the time it passed the Arizona Enabling Act, and statehood was expressly conditioned on the "perfect toleration of religious sentiment." Arizona Enabling Act § 20, ¶ First. In addition, Congress required that "provisions shall be made for the establishment and maintenance of a system of public schools which shall be open to all the children of said State and free from sectarian control." *Id.* ¶ Fourth. Further, "no part of the proceeds arising from the sale or disposal of any lands granted herein for educational purposes shall be used for the support of any sectarian or denominational school, college, or university." *Id.* § 26. Such conditions were common to several western states seeking admission to the union. *See* ROBERT LARSON, NEW MEXICO'S QUEST FOR STATEHOOD 1846–1912 (1968); Robert F. Utter & Edward J. Larson, *Church and State on the Frontier: The History of the Establishment Clauses in the Washington State Constitution,* 15 HASTINGS CONST. L.Q. 451, 458–69 (1988) (description of background and emotion surrounding Blaine Amendment and influence on wording of constitutions in emerging western states).

¶ 121 Numerous, and often repetitive, propositions bearing on religion and education were introduced, considered, and ei-

ther incorporated or rejected at our 1910 convention. As initially drafted, Proposition 15, which was the first dealing with education, contained a detailed proscription of state funding of sectarian schools and then substantially tracked the language of the 1891 Draft Constitution and prior legislation. It provided:

> Neither the Legislature or any county, city, town, township, school district or other public corporation shall ever make any appropriation or pay from any public fund or moneys whatever in aid of any church or sectarian or religious society, or any sectarian or religious purpose, or to help support or sustain any schools, academy, seminary, colleges, universities, or other literary or scientific institutions controlled by any church or sectarian or religious denomination whatsoever, nor shall any grants or donations of any lands, moneys or other personal property ever be made by the State or any other such public corporation to any church, or any sectarian or religious purpose.
>
> No ... teacher or student of any [public educational] institutions shall ever be required to attend or participate in any religious service whatever. No sectarian or religious tenets or doctrine or doctrines shall ever be taught in public schools. No books, papers, tracts or documents of a political, sectarian or denominational character shall be used or introduced in any schools established under the provisions of the Legislature of the State of Arizona, nor shall any teacher of any district receive any of the public school money in which the schools have not been taught in accordance with the provisions of this section.

THE RECORDS OF THE ARIZONA CONSTITUTIONAL CONVENTION OF 1910 (John S. Goff, ed.) (hereinafter RECORDS), Proposition 15, §§ 4 and 6, at 1065–66.

¶ 122 One day after the introduction of Proposition 15, delegate Crutchfield, a Methodist minister, introduced Proposition 41. Notably, Crutchfield's proposal differed from Proposition 15 in that it explicitly permitted nonsectarian religious instruction by omitting Proposition 15's proscription that "no teacher or student of any [public educational] institu-

tions shall ever be required to attend or participate in any religious service whatever" and closing with a clause borrowed directly from the Blaine Amendment: "Provided, [t]hat nothing herein contained shall be interpreted as forbidding the reading of the Bible in the public schools." *Id.* at 1139.

¶ 123 Both Propositions 15 and 41 were referred to the Committee on Education. On November 14, the Committee recommended rejection of Proposition 41 and approval of a Substitute Proposition 15 that more concisely stated the proscription on use of public funds for sectarian purposes: "[N]o public funds of any kind or character whatever, state, county or municipal, shall be used for sectarian purposes." *See id.* at 555, 1360, 1364–65. The convention eventually rejected Proposition 41 by postponing it indefinitely. *Id.* at 540. The majority is not correct, therefore, in stating that the convention transcripts "reveal almost nothing about the clauses in question." Op. at ¶ 58.

¶ 124 Thus far in the convention, no explicit discussion of state support of religion had taken place. On November 19, the only speech given on the issue was made by delegate William J. Morgan, a former territorial legislator from Navajo County. The *Arizona Gazette* reported his speech on tax exemption of church property as follows:

> He began his address by quoting from former President Grant, who said that if the evils resulting from the extensive acquisition of property by the churches were not corrected they would soon lead to trouble. General Grant in that famous argument said that with the growth of ecclesiastical property the time would probably come when sequestration would come about and that it would in all probability be attended by the shedding of blood.
>
> * * *
>
> Morgan argued for free speech, free thought and a free press[,] for the separation of church and state, for keeping the Bible out of the public schools, and for the taxation of all property. He quoted decisions of the supreme courts of Illinois and

Wisconsin that the Bible is legally sectarian.

Arizona Gazette, Nov. 19, 1910, at 1.

¶ 125 While it is impossible to discern the precise effect of Morgan's strong words on the delegates, his speech nonetheless demonstrates that some of the delegates adhered to extreme views on separating church from state. More important, Morgan's statements referring to President Grant's calls for strict separation of church and state show the delegates' familiarity with the Blaine Amendment. *See id.* This, coupled with Morgan's calls to proscribe Bible reading in public schools, mirrors the strict separationist positions previously taken by the Legislative Assembly as evidenced, for example, by the 1885 school law proscribing all religious exercises.

¶ 126 Although Morgan's proposals to prohibit tax exemptions were ultimately rejected, his views on Bible reading were adopted. Crutchfield's Proposition 41 was killed only three days after Morgan's speech, and the amended Proposition 15 was adopted by the delegates. RECORDS, at 555.

## B. Text and intent

¶ 127 From this record, it is clear the delegates sought to preserve strict separation of church and state in the public schools by excluding all religious exercise, consistent with Arizona's territorial history. In fact, Arizona's constitution far exceeds the Enabling Act's requirements. *Cf.* Utter & Larson, *supra,* 15 HASTINGS CONST. L.Q. at 467–69 (discussing how the Washington clauses were adopted to effectuate Blaine agenda).

In my view, the import of the framers' choice not to adopt Proposition 41's Bible-reading provisions is clear: Given the delegates' stance on religious exercise in the public schools and the breadth of Arizona's strong policy of refusing to fund private or sectarian education, the delegates clearly intended to prohibit state sponsorship or support of sectarian schools. They expressed this intent three times and in clear English. In article II, § 12: "No public money or property shall be appropriated for or applied to any religious worship, exercise, or instruction, or to the support of any religious establishment." And in article IX, § 10: "No tax shall be laid or appropriation of public money made in aid of any church, or private or sectarian school, or any public service corporation." And in article XI, § 7: "No sectarian instruction shall be imparted in any school or State educational institution that may be established under this Constitution. . . ."

¶ 128 Additional evidence of Arizona's separationist commitment is adduced from an examination of the Blaine clauses of the 1889 Washington Constitution,[14] after which much of the Arizona Constitution, especially article II, was modeled. *Mountain States Tel. & Tel. Co. v. Arizona Corp. Comm'n,* 160 Ariz. 350, 356 n. 12, 773 P.2d 455, 461 n. 12 (1989).[15] Article I, § 11 of the Washington Constitution is in pertinent part identical to Arizona's article II, § 12. It is therefore safe to assume that our provision was borrowed. Thus, Washington cases interpreting their constitution are persuasive authority with respect to our constitution. *See Schultz v. City of Phoenix,* 18 Ariz. 35, 42, 156 P. 75,

---

**14.** Utter & Larson, *supra,* 15 HASTINGS CONST. L.Q. at 468–69. The majority argues that we should give little heed to Washington's constitutional provisions, even though they are identical to ours, and less to Washington's decisions on this subject, even though we have many times indicated that decisions from Washington's courts with respect to our constitutional provisions will be given great weight. Op. at ¶¶ 68, 70. But Washington's clauses, like Arizona's, came from the national debate described above and reflect a common view of the prohibition on using public funds to promote any sectarian instruction. *Id.*

**15.** *See Roosevelt Elem. Sch. Dist. v. Bishop,* 179 Ariz. 233, 247 & n. 4, 877 P.2d 806, 820 & n. 4

(1994) (Feldman, J., concurring) ("our delegates routinely borrowed provisions from the Washington Constitution,") (citing *Mohave County v. Stephens,* 17 Ariz. 165, 170–71, 149 P. 670, 672 (1915) ("section 4, art. 6 of our Constitution is taken almost word for word from the Washington Constitution"); *Faires v. Frohmiller,* 49 Ariz. 366, 371, 67 P.2d 470, 472 (1937) (as "far as its judicial features were concerned," the Arizona Constitution was evidently modeled on similar provisions" in the Washington Constitution); *Desert Waters, Inc. v. Superior Court,* 91 Ariz. 163, 166, 370 P.2d 652, 654 (1962) (Arizona constitutional clause against uncompensated taking of private property "was adopted from the constitution of Washington")).

77 (1916) (When clauses in the Washington Constitution are "very much like the same provisions" in our constitution, "we think the law announced by [the Washington Supreme Court] is very persuasive."). The court does not tell us why we should abandon that rule, except to say that Washington and Arizona are different. Op. at ¶ 68, 70. No doubt this is true, but our constitutional text was extensively borrowed from Washington and our jurisprudence has always looked to Washington.

¶ 129 The Washington cases demonstrate that state's absolute proscription on any state support, direct or indirect, to secular education. *See Witters v. Washington Comm'n for the Blind*, 112 Wash.2d 363, 771 P.2d 1119 (1989) (financial vocational assistance to student who was pursuing a Bible studies degree violated state constitution); *Washington State Higher Educ. Assistance Auth. v. Graham*, 84 Wash.2d 813, 529 P.2d 1051 (1974) (state purchase of loans made to students at sectarian schools, while indirect and incidental, was unconstitutional attempt to circumvent provisions of state constitution forbidding any use of public funds to support sectarian schools); *Weiss v. Bruno*, 82 Wash.2d 199, 509 P.2d 973 (1973) (public funds for financial assistance to secondary and elementary students at nonpublic schools violates state constitution). As with Arizona's tax credit, none of these programs dealt with direct appropriation to schools.

¶ 130 Given the history of the Blaine Amendment, the stringent language of our constitution, the framers' indisputable desire to exceed the federal requirements, the Washington model, and the specificity of our constitution's proscription of state aid to private and secular schools, I think it is absolutely clear the constitution prohibits the tax credit at issue in this case. Leaving aside its facade and ingenious methodology, the Arizona tax credit grants a state subsidy to private and sectarian schools and thus violates both the text and the intent of our constitution.

¶ 131 The majority concedes the potential that the government subsidization of private schools may weaken the public school system. The wisdom of such policy making, it

says, is a matter left to the Legislature. Op. at ¶ 63. But the history and text of Arizona's religion clauses make it clear that the delegates to the 1910 convention were well aware of the recent sectarian battles and the resulting Blaine Amendment and did not intend to give the Legislature the power to subsidize a private, sectarian school system.

¶ 132 Of course, if legislators wish to revive what is foreclosed by our constitutional history and text, they may propose a constitutional amendment. Should Arizona's citizens want to repeal our constitutional prohibitions, they may adopt such an amendment. But this court ought not destroy our framers' intent, which is exactly what it does by finding some distinction between direct appropriation and government-sponsored diversion of tax funds. Constitutional principle prevents the state from doing by indirection what the constitution forbids it to do directly.

### C. Public money—deductions and credits

¶ 133 The majority next suggests an overly narrow interpretation of the term "public money" and concludes there is no constitutionally significant difference between a general tax deduction for a contribution to a private school and the Arizona tax credit. Op. at ¶ 38. I believe the majority is wrong on both counts.

### 1. Whether tax credits are public money

¶ 134 The majority argues that because the state lacks possession and immediate control of the tax credit funds, they are not public money. Op. at ¶¶ 36–38. The same can be said, of course, about funds in an escrow account that are payable to the state on closing, debts owed the state but not yet due and payable, taxes due (after all credits) but not yet paid, and innumerable other funds that are owed but have not yet reached the treasury. It is a dangerous doctrine that permits the state to divert money otherwise due the state treasury and apply it to uses forbidden by the state's constitution. But that, of course, is the exact result of today's decision.

¶ 135 The majority observes that neither the constitution nor the statutes explicitly define public money. Op. at ¶ 33. It then strains to extrapolate a definition of public money to be applied to the religion clauses from taxpayer standing cases such as *Grant v. Board of Regents*, 133 Ariz. 527, 652 P.2d 1374 (1982), and state tax forms. Op. at ¶¶ 34–36. The issue in *Grant*, however, was whether "a taxpayer can maintain an action to enjoin the wrongful expenditure of state funds where the funds in question are not raised by taxation or where the plaintiffs have not in some way contributed to them." 133 Ariz. at 529–30, 652 P.2d at 1376–77.

¶ 136 *Grant* and the other authorities the majority cites involve bureaucratic management and mismanagement of public finances, problems that can arise only when funds are in actual possession or control of state agencies. The definitions in those cases are irrelevant to cases involving state subsidies. If the court need infer a definition of public money, we would be better to find it in the statutory provisions dealing with the precise matters at issue in this case.

¶ 137 The tax code does define public money when read in conjunction with legislative and executive branch implementation of our constitution. Article IX, § 4 provides that an "accurate statement of the receipts and expenditures of the *public money* shall be published annually, in such manner as shall be provided by law." (Emphasis added.) The Legislature has implemented this constitutional requirement:

A. The director [of the Department of Revenue] shall be directly responsible to the governor for the direction, control and operation of the department and shall:

\* \* \*

4. In addition to the report required by paragraph 2 of this subsection, on or before November 15 of each year issue a written report to the governor and legislature detailing the approximate costs in lost revenue for all state tax expenditures in effect at the time of the report. For the purpose of this paragraph, *"tax expenditure"* means any tax provision in state law which exempts, in whole or in part, any persons, income, goods, services or property from the impact of established taxes including deductions, subtractions, exclusions, exemptions, allowances and *credits*.

A.R.S. § 42–105 (emphasis added). Thus, the Legislature clearly views the article IX, § 4 words "receipts and expenditures of public money" to embrace "tax expenditures," including tax credits.

¶ 138 The executive branch also views tax credits and deductions as "tax expenditures" similar to direct appropriations. Thus, in the annual report to the Legislature required by § 42–105, the Department of Revenue explains:

> *Tax expenditures are* provisions within the law (exemptions, exclusions, *deductions and credits* ) that are designed to encourage certain kinds of activity or aid to taxpayers in certain categories. Such provisions, when enacted into law, result in a loss of tax revenues, thereby reducing the amount of revenues available for state (as well as local) programs. *In effect, the fiscal impact of implementing a tax expenditure would be similar to a direct expenditure of state funds.*

ARIZONA DEPARTMENT OF REVENUE, THE REVENUE IMPACT OF ARIZONA'S TAX EXPENDITURES 1 (May 1998) (emphasis added).

¶ 139 Legislative and executive branch determination that tax expenditures such as tax credits comprise public money, plainly comports with long established, fundamental principles of public finance.[16] *See, e.g.,* Stanley S. Surrey, *Tax Incentives as a Device for*

---

16. Note, however, that there is a difference between deductions and credits. A progressive income tax "must tax only net income if its taxable base is to have some relationship to a taxpayer's ability to pay, a goal we [seek]. The income tax system requires a particular class of deductions or exclusions to prevent its taxing gross receipts (a base that is unrelated to the taxpayer's ability to pay). For example, exclusions for capital recoveries and deductions for costs of production are needed to secure an accurate measure of net income. Such deductions and exclusions, properly timed, help refine the net income concept and are called 'normative' provisions, not tax expenditures." Bernard Wolfman, *Tax Expenditures: From Idea to Ideology*, 99 HARV. L. REV. 491, 491–92 (1985).

*Implementing Government Policy: A Comparison with Direct Government Expenditures*, 83 HARV. L. REV. 705, 706 (1970) ("The term 'tax expenditure' has been used to describe those special provisions of the federal income tax system which represent government expenditures made through that system to achieve various social and economic objectives."). The majority debates our characterization of a tax credit as an expenditure of public money. Op. at ¶¶ 37–38, 40. But it is clear that the leading scholars in the field reject the majority's views. So also do Arizona's legislative and executive branches, charged with the power and responsibility to collect and spend public funds.

¶ 140 Courts throughout the country also are well aware that tax credits are expenditures of public money. The majority overlooks the great body of precedent dealing with the religion clauses. Other courts, state and federal, have long viewed "tax subsidies or tax expenditures [similar to Arizona's tax credit as] the practical equivalent of direct government grants." *Opinion of the Justices to the Senate*, 401 Mass. 1201, 514 N.E.2d 353, 355 (1987); *see also Arkansas Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 236, 107 S.Ct. 1722, 1731, 95 L.Ed.2d 209 (1987) (Scalia, J. dissenting) ("Our opinions have long recognized—in First Amendment contexts as elsewhere—the reality that tax exemptions, credits, and deductions are 'a form of subsidy that is administered through the tax system,'") (quoting *Regan v. Taxation With Representation*, 461 U.S. 540, 544, 103 S.Ct. 1997, 2000, 76 L.Ed.2d 129 (1983)); *Nyquist*, 413 U.S. at 791, 93 S.Ct. at 2974 (money available through tax credit is charge made against state treasury; tax credit is "designed to yield a predetermined amount of tax 'forgiveness' in exchange for performing a certain act the state desires to encourage"); *Public Funds for Public Schools v. Byrne*, 444 F.Supp. 1228 (D.N.J.1978), *aff'd*, 590 F.2d 514 (3d Cir.1979); *Minnesota Civil Liberties Union v. Minnesota*, 302 Minn. 216, 224 N.W.2d 344 (1974), *cert. denied*, 421 U.S. 988, 95 S.Ct. 1990, 44 L.Ed.2d 477 (1975); *Curchin v. Missouri Indus. Dev. Board*, 722 S.W.2d 930, 933 (Mo.1987) ("tax credit is as much a grant of public money or property and is as much a drain on the state's coffers as would be an outright payment by the state ....").

¶ 141 Moreover, our own legislature leaves little question that it views the specific tax credit at issue in this case as a matter involving public funds. It requires that the "director of the department of revenue shall submit a report to the governor, the president of the senate and the speaker of the house of representatives regarding the *fiscal impact* of the tax credit provided for donations to school tuition organizations on July 1, 1999." Laws 1997, Ch. 48, § 4 (emphasis added).

¶ 142 Finally, the judicial wisdom of treating such tax expenditures as public money comports with one of the nation's most reputable experts on the subject:

The U.S. Constitution and some statutory legislation impose restraints on the spending of government funds. Thus, under constitutional doctrines, the government may in general not engage in activities that are discriminatory in terms of race or sex, for example, or act without due regard for fair procedures and process. Direct government spending programs that involve such practices can be challenged in the courts. Private entities that receive significant support from government funds and engage in such practices are likewise subject to challenge. The question ... is whether these constitutional doctrines also apply to tax expenditure benefits and to private entities receiving them. Given that tax expenditures are government assistance programs, it would seem almost axiomatic that they should.

STANLEY S. SURREY AND PAUL R. McDANIEL, TAX EXPENDITURES 118 (1985). The authors expressly consider whether "the grant of an income tax credit" to "parents of children who send their children to parochial schools" should be included among the numerous constitutional issues involving tax expenditures. Unsurprisingly, they conclude:

Judicial cases involving constitutional or interpretative issues with regard to tax expenditures should be decided in the same manner as cases involving direct gov-

ernment spending programs. Given the federal government's own assertion that tax expenditures "can be viewed as alternatives to budget outlays, credit assistance or other policy instruments," and the "[tax] expenditures have objectives similar to those programs funded through direct appropriations," it is difficult to see how this position can be denied. *Id.* at 154 (quoting U.S. Government, Special Analysis G, 203, 1981).

¶ 143 The majority argues that there is a real debate about whether tax credits constitute public funds. Op. at ¶ 41. This argument resurrects a discredited critique of the tax expenditure concept. The United States Supreme Court spoke on that dead school of thought recently, observing that the "wholesale rejection of tax expenditure analysis was short-lived and attracted few supporters. Rather, *the large body of literature about tax expenditures accepts the basic concept that special exemptions from tax function as subsidies.*" *Rosenberger v. Rector & Visitors,* 515 U.S. 819, 861 n. 5, 115 S.Ct. 2510, 2532 n. 5, 132 L.Ed.2d 700 (1995) (Thomas, J., concurring) (quoting Donna D. Adler, *The Internal Revenue Code, The Constitution, and the Courts: The Use of Tax Expenditure Analysis in Judicial Decision Making,* 28 WAKE FOREST L. REV. 855, 862 n. 30 (1993)) (emphasis added).

¶ 144 The majority in *Rosenberger* also makes it quite clear that the expenditure of funds that have not and will never enter the public treasury is nevertheless the use of public money subject to scrutiny under the federal Establishment Clause, a provision much less specific than our constitutional provisions. *Id.* at 842–43, 115 S.Ct. at 2523–24.

¶ 145 In sum, the majority's narrow interpretation of public money in a religion clause case is without precedential support and is contrary to academic and expert views as well as federal and state cases. Absent the taxing power, the money would not exist. In my estimation, the majority's attempt to support the credit with a comparison to valid tax deductions only makes the matter worse.

**2. Deductions versus credits**

¶ 146 The majority argues that Arizona's tax credit must be valid because there is no significant difference between it and long-recognized, valid tax deductions and credits. It fears that invalidating the private school tax credit "directly contradicts [Arizona's] decades-long acceptance" of charitable deductions and tax exemptions for churches and other religious institutions. Op. at ¶¶ 38, 43. I disagree.

¶ 147 There are very significant differences between valid tax benefits and the Arizona tax credit. The latter is not an inducement to charitable giving; there is no philanthropy at all because the credit provided is dollar-for-dollar. A taxpayer's $500 donation is rebated as a credit against the tax that otherwise would be paid to the state. It is a bottom-line reduction—money that *would,* in its entirety, go to the treasury.

¶ 148 Most of us do not enjoy paying taxes, and one would suspect that a large number of Arizonans faced with the choice of directing $500 to an STO supporting their favorite religious institution or to the tax collector would prefer the former, especially if there is a chance to make a profit.[17] Unlike a neutral deduction available for all charitable giving, the credit is not governmental encouragement of philanthropy. Instead, it is a direct government subsidy limited to supporting the very causes the state's constitution forbids the government to support.[18]

17. Arizonans may well make a profit on the tax credit. After a taxpayer has contributed to the STO and received a dollar-for-dollar refund from the Arizona Department of Revenue, nothing in the Internal Revenue Code prevents him or her from reporting the contribution as a charitable deduction on the federal income tax return. The taxpayer cannot do so on the state return because § 43–1089(C) states that the credit is "in lieu of any deduction pursuant to section 170 of the Internal Revenue Code and taken for state tax purpose." However, the Internal Revenue Code has no similar provision.

18. It is interesting to note the degree of governmental encouragement provided by deductions compared to that provided by credits. Under § 43–1089, a couple with an income of $60,000 per year sending $500 to an STO would receive a tax credit of $500 and would thus save $500 in taxes. The "contribution" would cost them nothing. The same couple contributing to al-

Unlike neutral deductions, the credit is not the state's passive approval of taxpayers' general support of charitable institutions. Thus, there is no philanthropy here, no neutrality, and no limitation to secular use.

¶ 149 The majority argues that the Arizona tax credit is just one among many available credits. Op. at ¶ 15. This is true, but unlike valid tax credits, the private school tax credit supports an activity the constitution forbids the state to support. Other Arizona tax credits, such as those provided by §§ 43–1083 and 43–1084 (for installation of solar energy devices and purchase of agricultural water conservation systems), grant tax subsidies for programs the Legislature could support by direct appropriation if it so desired. As with the private school tax credit, the Legislature seeks by partial subsidization to encourage private action by Arizona's citizens. But the state constitution forbids subsidization of religious education, whether full or partial. As article II, § 12 says, "*No public money . . . shall be appropriated for or applied to any religious worship, exercise, or instruction. . . .*" (Emphasis added.) That prohibition is reinforced by article IX, § 10, which says, "*No tax shall be laid or appropriation of public money made in aid of any . . . private or sectarian school.*" (Emphasis added.)

¶ 150 At present, the subsidy is capped at $500, but there is no principled reason under the majority's analysis that the limit could not be increased to whatever sum the Legislature chooses until the state is, in effect, paying the full cost of private, sectarian education. Pragmatically, today's opinion simply writes article II, § 12 out of the state constitution.

¶ 151 There is no need for this. The framers' intent to forbid governmental aid to private or sectarian schools does not require proscription of all deductions or exemptions. We are squarely confronted with two fundamental axioms of constitutional interpretation. On the one hand "we are bound to uphold the Arizona Constitution, and the spirit and purpose of that instrument may not be defeated." *Selective Life Ins. Co. v. Equitable Life Assur. Soc.*, 101 Ariz. 594, 598, 422 P.2d 710, 714 (1967). On the other hand, as the majority recognizes, "in order to fulfill the original intent of the constitution, [its provisions] must be viewed in the light of the contemporary society, and not strictly held to the meaning and context of the past." *Community Council v. Jordan*, 102 Ariz. 448, 454, 432 P.2d 460, 466 (1967).[19] In balancing these considerations, we need not subscribe to an absolutist position that offends historical practices recognized since statehood or to a position that ignores the obvious and imperative text and intent of the state constitution. There is a middle road that accounts for both considerations.

most any other qualified philanthropic cause would receive a deduction from gross income. To reduce their state taxes by $500, that couple would need to contribute approximately $13,000. *See* Tax Tables, Arizona Department of Revenue, 1998.

**19.** The majority finds specific support in *Community Council*. Op. at ¶¶ 45, 57–58. *Community Council* is not on point. It holds that the state may reimburse a community council for its "direct financial aid [to the indigent] in emergency situations" without violating the Arizona Constitution, even though the Salvation Army, a religious organization, was the central agency through which the aid was disbursed and the Phoenix Council of Churches participated in choosing the disbursement agency. 102 Ariz. at 450–51, 432 P.2d at 462–63. But in *Community Council* the ultimate recipients of aid were the impoverished persons, not religious organizations, as is the situation in the case before us. In *Community Council* neither the Council's initial contributions nor the state's reimbursements were used to further sectarian observance or instruction but, rather, to provide a form of welfare assistance. This, of course, is something for which the Legislature could have made a direct appropriation. I have no quarrel with *Community Council*. It would be a strange rule indeed that would prevent the state from utilizing the beneficial services of religious organizations to help the needy or to accomplish any other goal perceived as worthwhile and not prohibited by the constitution. The constitution does not require government to sever contact with religious institutions or to dispense with their help. It does prohibit providing them with the money with which to instruct in and inculcate their religious beliefs. In the present case, unlike *Community Council*, the money does not pass through the religious institution to help the needy. Instead, it stays in the religious organizations, where it may be used for religious instruction and observance for all, rich and poor.

¶ 152 The framers had no specific intent to invalidate generalized charitable tax deductions for grants to private and sectarian schools. As shown by their treatment of Morgan's exemption proposition, they intended to continue the practice of property tax exemptions for charitable institutions, including churches and religious schools. *See* article IX, § 2. At the time our constitution was written there was no income tax, state or federal, and no deductions to worry about. Since the 1913 adoption of the Sixteenth Amendment to the federal constitution and subsequent imposition of federal and state income taxes, a historical acceptance has grown around deductions for generalized charitable giving, much like that recognized for exemptions under the state and federal constitutions. *Walz v. Tax Comm'n,* 397 U.S. 664, 669–70, 90 S.Ct. 1409, 1411, 25 L.Ed.2d 697 (1970).[20] There is no need to fear that invalidation of the Arizona tax credit will upset the apple cart and invalidate tax exemptions and deductions for charitable giving to churches, private and religious schools, and similar institutions. The historical practice of allowing such benefits as part of the state's encouragement of general philanthropy, combined with a neutral program provid-

ing such benefits for contributions to all charitable, nonprofit endeavors, does not offend the constitution. The Arizona tax credit, however, is available only for grants to predominantly religious institutions. General deductions and exemptions are but two of many philanthropic private choices taxpayers may make as an accepted element of contemporary democracy.[21] The tax credit is simply a badly disguised end-run around the state constitution. It is as invalid as a statute limiting charitable deductions only to contributions to religious organizations.

¶ 153 Indeed, it is quite likely that prohibiting deductions for charitable contributions to religious institutions or schools when such deductions are generally permitted for contributions to all types of other charitable institutions would discriminate against religion and thus violate the Free Exercise Clause of the First Amendment. *Rosenberger,* 515 U.S. at 849–51, 115 S.Ct. at 2526–28 (O'Connor, J., concurring); *Lamb's Chapel v. Center Moriches Union Free Sch. Dist.,* 508 U.S. 384, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993); *Widmar,* 454 U.S. at 274, 102 S.Ct. at 277.

---

20. *Walz* speaks to the historical acceptance of exemptions for religious institutions:

All of the 50 States provide for tax exemption of places of worship, most of them doing so by constitutional guarantees. For so long as federal income taxes have had any potential impact on churches—over 75 years—religious organizations have been expressly exempt from the tax.... Few concepts are more deeply embedded in the fabric of our national life, beginning with pre-Revolutionary colonial times, than for the government to exercise at the very least this kind of benevolent neutrality toward churches and religious exercise generally *so long as none was favored* over others and none suffered interference.

*Id.* at 676–77, 90 S.Ct. at 1415 (emphasis added) (footnote omitted).

[A]n unbroken practice of according the exemption to churches, openly and by affirmative state action, not covertly or by state inaction, is not something to be lightly cast aside. Nearly 50 years ago Mr. Justice Holmes stated: 'If a thing has been practised for two hundred years by common consent, it will need a strong case for the Fourteenth Amendment to affect it....' Jackman v. Rosenbaum Co., 260 U.S. 22, 31, 43 S.Ct. 9, 10, 67 L.Ed. 107 (1922).

*Id.* at 678, 90 S.Ct. at 1416.

21. Again, the analogy to exemptions is useful. *Walz* establishes the constitutionality of exemptions due to their neutrality toward religion, using words quite applicable to deductions, credits, and other tax benefits:

The legislative purpose of a property tax exemption is neither the advancement nor the inhibition of religion; it is neither sponsorship nor hostility. New York, in common with the other States, has determined that certain entities that exist in a harmonious relationship to the community at large, and that foster its 'moral or mental improvement,' should not be inhibited in their activities by property taxation or the hazard of loss of those properties for nonpayment of taxes. It has not singled out one particular church or religious group or even churches as such; rather, it has granted exemption to all houses of religious worship *within a broad class of property owned by nonprofit, quasi-public corporations which include hospitals, libraries, playgrounds, scientific, professional, historical, and patriotic groups.* The State has an affirmative policy that considers these groups as beneficial and stabilizing influences in community life and finds this classification useful, desirable, and in the public interest.

397 U.S. at 672–73, 90 S.Ct. at 1413.

**D. Article IX, § 10 and the laying of taxes**

¶ 154 In two brief paragraphs, the majority asserts that article IX, § 10, which states that no tax should be "laid ... in aid of any church, or private or sectarian school, ..." is inapplicable because a "tax credit is not an appropriation of public money.... To the contrary, this measure *reduces* the tax liability of those choosing to donate to STOs." Op. at ¶¶ 49, 50 (emphasis in original).

¶ 155 I cannot agree. The majority does not tell us how one can obtain a credit against a tax unless the tax is first laid. The school tax credit is an offset against taxes otherwise due and owing, as the statute itself describes it. *See* § 43–1089(B) (unused tax credits in any particular year may "offset" future taxes). The aid to private schools comes from a tax that was laid and imposed. Absent the state's levy of a tax, there would be nothing to offset and consequently no credit. Article IX, § 10 applies.

## CONCLUSION

¶ 156 We are all free to use *our* money to support any religious institution of *our* choice. Under the Free Exercise Clause, the government cannot prevent us from making that choice. It may passively encourage such philanthropy as part of a scheme of using tax benefits to support charitable giving of all types—to religious, nonreligious, educational, social service, and all the other institutions that qualify for deductions. So long as the tax benefits are general and neutral, they may be allowed even though some of the institutions supported are those the government is prohibited from assisting by direct grants or subsidies.

¶ 157 But the Arizona tax credit is quite different. It is directed so that it supports only the specific educational institutions the Arizona Constitution prohibits the state from supporting—predominantly religious schools. By reimbursing its taxpayers on a dollar-for-dollar basis the state excuses them from paying part of their taxes, but only if the taxpayers send their money to schools that are private and predominantly religious, where the money may be used to support religious instruction and observance. If the state and federal religion clauses permit this, what will they prohibit? Evidently the court's answer is that nothing short of direct legislative appropriation for religious institutions is prohibited. If that answer stands, this state and every other will be able to use the taxing power to direct unrestricted aid to support religious instruction and observance, thus destroying any pretense of separation of church and state.

¶ 158 I disagree for the reasons stated and respectfully dissent.

MOELLER, J. (Retired), concurs.